[No. 14026. *En Banc.* March 28, 1917.]

*In re* NICHOLAS RUDEBECK.[1]

HABEAS CORPUS—EXTRADITION—SCOPE OF INQUIRY. The courts of this state can and should inquire by habeas corpus, and determine whether an indictment upon which a warrant of extradition is based substantially charges the accused with a crime against the laws of the state to which he is sought to be returned; but cannot go into the merits of the case in an effort to determine his guilt or innocence nor decide the technical sufficiency of the proceeding.

SAME—INDICTMENT—FALSE PRETENSES—SUFFICIENCY. Upon habeas corpus proceedings to relieve from a warrant of extradition, it will be held that an indictment by a grand jury in Iowa substantially charges a violation of Code of Iowa 1897, § 5041, relating to false pretenses whereby any person, with intent to defraud, shall obtain any money, goods, or other property, where the indictment alleges the obtaining of money by false pretenses with intent to deceive by false representations as to the assets of a corporation whereby the prosecuting witness was induced to purchase stock, and it is unnecessary to allege that the stock was not worth what was paid for it, since the purchaser was actually defrauded if he did not get what he bargained for.

Appeal from a judgment of the superior court for Thurston county, D. F. Wright, J., entered February 17, 1917,

[1]Reported in 163 Pac. 930.

denying relator's petition for a writ of habeas corpus, after
a hearing before the court.   Affirmed.

*Howard Hathaway, Thos. M. Vance,* and *E. H. Guie,* for
appellant.

*Carkeek & McDonald,* and *Parr & Marts,* for respondent.

Webster, J.—This is an appeal from a judgment of the
superior court of Thurston county, denying the petition of
relator to be released from custody on *habeas corpus.*

On September 1, 1916, the governor of the state of Iowa
issued a requisition in the usual form, directed to the gov-
ernor of the state of Washington, setting forth that relator
stands charged, by indictment in the former state, with the
commission of the crime of cheating by false pretenses; that
this offense is a crime under the laws of that state, and that
relator had fled from the justice of the state of Iowa and
had taken refuge in the state of Washington.   A demand
was duly made that the relator be delivered to the agent
representing the state of Iowa, to be returned to that state
to answer the charge there pending against him.   After a
hearing, this requisition was honored by the governor of
Washington, and a warrant of extradition in due form was
issued, under the command of which relator was surrendered
to Henry Terrell, Esq., the agent of the demanding state.
Immediately relator applied to the superior court of Thurs-
ton county for a writ of *habeas corpus.*   The writ was issued
but, after a hearing before the court, relator was remanded
to the custody of the agent of the state of Iowa and the pro-
ceeding was dismissed.   From this judgment, relator appeals.

Counsel for relator insist that the indictment upon which
the warrant of extradition is based does not charge a crime
under the laws of the state of Iowa.   The first question pre-
sented by this appeal is to what extent may the courts of
this state inquire by *habeas corpus* into the legality and suf-
ficiency of the indictment upon which a warrant of extradi-
tion is based.   In the case of *Armstrong v. Van De Vanter,*

21 Wash. 682, 59 Pac. 510, this question was carefully considered by this court and, after a somewhat extended examination of the authorities, it was held that the basis of the right of a sister state to demand the rendition of a fugitive from the justice of that state, who had taken refuge in the state of Washington, is an affirmative showing upon the part of the demanding state that its laws have been violated by the alleged fugitive. It was said that the party demanded may be, and frequently is, a *bona fide* resident and citizen of the state upon which the requisition is made, and to hold that such parties should be discriminated against in the administration of the criminal law and should be deprived of rights and privileges which are accorded to other citizens charged with crime, would not be in keeping with the spirit of our laws or the genius of our institutions, and would unnecessarily tend to a subversion of personal liberty; that it was, therefore, a pertinent question in *habeas corpus* proceedings to ascertain whether the criminal pleading upon which the requisition is based substantially charges a crime against the laws of the demanding state. In the case of *In re Baker*, 21 Wash. 259, 57 Pac. 827, it was held that it was the province of the courts of the asylum state to determine whether a crime against the laws of the demanding state is substantially charged in the indictment upon which the warrant of extradition is based, but that the investigation is limited in its scope; that the courts of the state upon which the requisition is made should not undertake to determine whether the indictment conforms to the technical rules of pleading prescribed by the laws of the demanding state.

We have again carefully examined the question in the light of cases decided since the opinions in the *Van De Vanter* and *Baker* cases were written. As the result of our investigation, we are convinced that the overwhelming weight of authority is to the effect that, where the complaint, information, or indictment upon which the warrant of extradition has been granted is before the court of the asylum state, it is not only

the right, but the duty of the court to examine it and deter-
mine whether the accused is substantially charged with the
commission of a crime against the laws of the state to which
he is sought to be returned.  The courts of the asylum state,
however, will not go into the merits of the case in an effort
to determine the guilt or innocence of the accused, nor will
they concern themselves with the technical sufficiency of the
pleading.  Their right of legitimate inquiry extends no fur-
ther than to ascertain whether the pleading in question sub-
stantially charges the alleged fugitive with the commission
of an offense against the laws of the demanding state.  If
the pleading under inspection meets this test and the pro-
ceedings are in other respects regular, the courts of the
asylum state should not interfere, even though the charge in
the indictment does not conform to the technical rules of
criminal pleading.  Our former holdings are in keeping with
this doctrine and we are satisfied with them.

In the recent case of *Drew v. Thaw*, 235 U. S. 432, the
supreme court of the United States, speaking through Mr.
Justice Holmes, said:

"When, as here, the identity of the person, the fact that
he is a fugitive from justice, the demand in due form, the
indictment by a grand jury for what it and the governor of
New York allege to be a crime in that state, and the rea-
sonable possibility that it may be such, all appear, the con-
stitutionally required surrender is not to be interfered with
by the summary process of *habeas corpus* upon specula-
tions as to what ought to be the result of a trial in the place
where the constitution provides for its taking place."

This holding is clearly to the effect that the courts of the
asylum state possess the power to examine the indictment
upon which the extradition proceeding is based for the pur-
pose of ascertaining whether it contains a charge of crime
against the laws of the state issuing the requisition.  The
language, "the indictment by a grand jury for what it and
the governor of New York allege to be a crime in that state,
and the reasonable possibility that it may be such," is but

the expression in a new formula of words of the settled principle that the courts of the asylum state must be clearly satisfied that the indictment or information does not charge a crime before they will interfere.

We shall not undertake to cite the vast array of cases, both state and Federal, sustaining the doctrine to which we have adverted. In the copious note to the case of *In re Waterman*, 11 L. R. A. (N. S.) 424, the authorities are collected and a number of them are analyzed and discussed.

Our conclusion, that it is the duty of the court to examine the indictment, brings us to a consideration of the question of whether it contains a substantial charge of crime as defined by the laws of the state of Iowa, and in making this inquiry, manifestly we are confined to the allegations of the indictment and the laws of that state. The specific objection urged against the indictment is that it does not contain an allegation that the person alleged to have been defrauded did, in fact, suffer an actual pecuniary loss; that is to say, it is not alleged that the Florence-Rae Lumber, Land & Development Company is insolvent, and consequently it does not negative the idea that the owner may be able to recover his money. The indictment is as follows:

"The grand jury of the county of Dubuque, in the name and by the authority of the state of Iowa, accuse Nicholas Rudebeck of the crime of cheating by false pretenses, committed as follows:.

"The said Nicholas Rudebeck on or about the 18th day of January in the year of Our Lord one thousand nine hundred and thirteen, in the county aforesaid, wilfully, unlawfully, designedly, falsely, feloniously, and by false token and false pretenses, and with the intent to defraud one Otto L. Groff, did, then and there, designedly, unlawfully, falsely, feloniously and fraudulently, pretend and represent to the said Otto L. Groff, that the Florence-Rae Lumber, Land and Development Company, a corporation of Seattle, Washington, was the owner of fourteen hundred acres of timber land with the standing timber thereon, in Snohomish county, state of Washington, and that said fourteen hundred acres of

standing timber belonged to said Florence-Rae Lumber, Land
and Development Company aforesaid, and consisted of many
million feet of timber and was worth many hundreds of thou-
sands of dollars, and did, then and there, unlawfully, feloni-
ously, designedly, and falsely pretend and represent that
said standing timber so owned by the Florence-Rae Lumber,
Land and Development Company was worth from nine to
twelve dollars per thousand feet on the stump, and that the
statement then contained in the book which the said Nicholas
Rudebeck had in his possession which gave the standing tim-
ber owned by the Florence-Rae Lumber, Land and Develop-
ment Company at one hundred and twenty-five million feet
worth three hundred and seventy-five thousand dollars was
true and correct, and did, falsely, unlawfully, feloniously,
and designedly represent and pretend that said Florence-Rae
Lumber, Land and Development Company did own said tim-
ber; and did, then and there falsely, unlawfully, feloniously
and designedly pretend and represent that the timber shown
by Nicholas Rudebeck to E. A. Fengler in Snohomish county,
State of Washington did in fact belong to the Florence-Rae
Lumber, Land and Development Company aforesaid, which
representations were false, and were known to the said Nich-
olas Rudebeck to be false and were made by the said Nicholas
Rudebeck with the intent to defraud said Otto L. Groff, and
obtain from said Otto L. Groff money and property of the
value of five hundred dollars, lawful money of the United
States of America, and of the currency of the United States
of America; a more particular description of which said
money is unknown, in exchange for a certificate of stock for
five hundred shares of the stock of the Florence-Rae Lumber,
Land and Development Company, and the said Nicholas
Rudebeck then and there delivered said certificates of stock
for five hundred shares of the capital stock of the Florence-
Rae Lumber, Land and Development Company to him, the.
said Otto L. Groff, and obtained from said Otto L. Groff,
the sum of five hundred dollars, with the intent to defraud
the said Otto L. Groff, when in truth and in fact the said
Florence-Rae Lumber, Land and Development Company did
not, in fact, own any timber land or standing timber in Sno-
homish county, state of Washington. And the said Otto L.
Groff, believing said representations made by the said Nich-
olas Rudebeck to be true, and being deceived thereby and

relying thereon, was induced by reason of said false repre-
sentations and false pretenses to part with his said money
and property to-wit: The sum of five hundred dollars, lawful
money of the United States of America, and all being the
money and property of the said Otto L. Groff, to him the said
Nicholas Rudebeck, and accept said certificate of stock for
five hundred shares of the capital stock of the Florence-Rae
Lumber, Land and Development Company, whereas in truth
and in fact the said Florence-Rae Lumber, Land and Develop-
ment Company did not own, have or hold any timber land or
standing timber in Snohomish county, state of Washington,
at the said time or prior thereto; all of which was well known
to the said Nicholas Rudebeck, and the said Nicholas Rude-
beck knew at the time of the making of the alleged repre-
sentations, that said representations regarding the Florence-
Rae Lumber, Land and Development Company, owning tim-
ber land in Snohomish county, state of Washington, were
false, and were by him made designedly, and by false pre-
tenses with the intent to deceive and obtain from the said
Otto L. Groff, money, goods, and property, contrary to the
statute in such cases made and provided and against the
dignity of the state of Iowa."

The statute of Iowa upon which the indictment rests reads
as follows:

"Section 5041. False pretenses. If any person designedly
and by false pretense, or by any privy or false token, and
with intent to defraud, obtain from another any money,
goods, or other property, or so obtain the signature of any
person to any written instrument, the false making of which
would be punished as forgery, he shall be imprisoned in the
penitentiary not more than seven years, or be fined not ex-
ceeding five hundred dollars, or imprisoned in the county jail
not exceeding one year, or both such fine and imprisonment."
Code of Iowa, 1897.

It will be observed that, unless the contention of relator is
sound, the indictment is clearly sufficient. Under this stat-
ute, the gist of the offense consists in obtaining the money or
property of another by means of false and fraudulent repre-
sentations or pretenses made with the intent to defraud. It
is settled by the great weight of authority, under statutes of

this character, that, when the owner is induced to, and in fact does, part with his property by reason of false pretenses made with the intent to deceive, the crime is complete, and it is wholly immaterial whether he actually or ultimately suffers a pecuniary loss or injury. Considerable confusion has arisen because of the fact that, in enumerating the constituent elements of the crime of obtaining money by false pretenses, the cases frequently declare that the owner must have been actually defrauded. But this expression does not imply that he must have suffered actual pecuniary loss. The failure to appreciate this distinction has been the cause of most of the misunderstandings, and has resulted in apparent rather than real conflict in the cases. The owner is actually defrauded when he parts with his property or money and fails to receive in exchange that for which he bargained. When the accused falsely represents to the owner that he is to receive in exchange for the money and property obtained from him a particular thing, and instead he receives another and entirely different thing, he is, in legal contemplation, actually defrauded.

In 19 Cyc., at page 411, the rule is stated in this language:

"F. Loss to Prosecutor. While the statutes do not in express language require that the person from whom the property is obtained should be defrauded thereby, but only that it be obtained with intent to defraud him, nevertheless it is uniformly held that the crime is not committed unless the prosecutor is in fact defrauded. Hence, if prosecutor gets out of the transaction just what he bargained for the offense is not committed. The injury to prosecutor may result from the loss of the property parted with, or from deprivation of the benefit he expected to accrue from defendant's representation, or from the property given him by defendant in exchange for the property parted with. In neither case is it necessary to the crime to show that he has suffered actual pecuniary loss, or that he will necessarily suffer such loss; but in the first case it is necessary that he at least be placed by the fraud of defendant in such a position that he may eventually suffer such loss; in the second, it is sufficient if he

does not receive for the property parted with the thing promised by defendant, even though he receives something else of equal value, less value, or no value at all. Since actual loss is not necessary, it is of course no defense that prosecutor has recovered, or may eventually recover, for any loss he has sustained."

In 11 R. C. L., at page 843, the rule is stated as follows:

"25. Necessity of Loss by Deceived.—In order that a person may be convicted of obtaining property by false pretenses the fraud must actually be accomplished to the extent that some one is prejudiced thereby. However, the gravamen of the offense is in making the false pretense, and obtaining thereby a person's property or signature, and does not depend upon ultimate loss to the victim or whether in fact he sustains any pecuniary loss."

. A careful examination of the Iowa cases demonstrates that they are not in conflict with the general rule. In *State v. Jamison*, 74 Iowa 613, 38 N. W. 509, a case where the defendant was charged, under the identical statute upon which the indictment in question is based, with having obtained, by false pretenses and with intent to defraud, the signature of a person to a written instrument, it was held that, while there must have been a delivery of the paper in order to consummate the intent to defraud, the actual consummation of the intended fraud need not be alleged or proved. In the course of the opinion, the court said:

"The court instructed the jury that 'there must be an intent to defraud, but actual defrauding is not necessary to be shown, provided the intent be proven.' It is said by counsel that this instruction is erroneous, for the reason that the fraud must be consummated, and that an intent is not sufficient. He cites and relies on *People v. Wakely*, 62 Mich. 297, and *State v. McGinnis*, heretofore cited. We understand the instruction to mean that it is not essential that any person should have been actually defrauded, but it is essential, if a written instrument is the thing obtained, that it should be delivered; for until this is done the intent to defraud is not consummated, for the reason that, until there

has been a delivery, the instrument creates no liability. The provision of the statute is that the thing, whether a chattel or a written instrument, must be obtained by the person making the false pretense, and this is the effect of the holding in the two cases above cited, referred to by counsel. But no case to which our attention has been called holds that any person must have been actually defrauded, that is, have suffered a pecuniary loss; and under the statute an intent to defraud only is required. Therefore the court did not err in giving the instruction referred to."

In this case it would seem that the precise question presented by counsel for relator was considered by the supreme court of Iowa and answered adversely to their contention.

In *State v. McConkey*, 49 Iowa 499, the defendant was charged with having falsely represented and pretended to one Hurst that a certain lot which defendant pointed out to him was the identical parcel of land for which he had bargained, when in truth and in fact, an entirely different tract was conveyed. The court said:

"Lastly, it is insisted that the indictment is insufficient because it does not allege that defendant was not the owner of the lot which he pointed out to Hurst. Appellant cites and relies upon *State v. Webb*, 26 Iowa 262, and 2 Wharton, § 2158. Neither of these authorities is applicable to the question. The fraud in this case does not consist in representing that defendant was the owner of a lot which he did not own, but in pointing out to Hurst a valuable lot as the one sold to him, and, in fact, conveying to him one of no value, the greater part of which was in the middle of the river. It is true, if defendant owned the lot pointed out as the one conveyed Hurst would, by his purchase, acquire an equitable interest therein, and might enforce a conveyance thereof, if defendant did not put it out of his power to convey by a sale to an innocent purchaser. But it is apparent that defendant might, at any time, by such conveyance deprive the purchaser of such remedy. Now, the quality of an act, whether criminal or otherwise, must depend upon the act itself, and not upon subsequent disconnected acts. We think, therefore, that if defendant had, in fact, owned the lot which he pointed out to Hurst, which the evidence shows he did not,

that he could not, because of that fact, escape criminal responsibility for his fraud."

While in this case the question was not discussed at length, the language of the opinion clearly indicates that the quality of the act depends upon the act itself and is not affected by subsequent possible events, and the decision turns upon the point that Hurst did not receive the property which defendant represented would be conveyed to him.

Counsel for relator rely largely upon the case of *State v. Foxton*, 166 Iowa 181, 147 N. W. 347, Ann. Cas. 1916E 727, 52 L. R. A. (N. S.) 919, which seems to be the latest expression of the supreme court of Iowa upon the question under consideration. As we read the case, it not only does not sustain relator's contention, but supports the contrary view. In this case the defendant was charged, under the statute above quoted, with the crime of cheating by false pretenses. It was alleged in the indictment that, for the purpose of obtaining from one Dickinson $50 in money, the defendant falsely represented and pretended that he had sufficient money on deposit in a certain bank to meet a check which he induced Dickinson to cash. It is true that, in enumerating the essential elements of the crime, the court said there must have been actual fraud, but immediately following this statement, this language is used (at page 197):

"The crime consists in inducing the owner to part with his goods or money, either by a willful falsehood as to an existing material fact, or by assuming a character he does not sustain, or by representing himself to be in a situation he knows he is not in. The false pretenses employed are only the means by which the offense is perpetrated. The false pretense or representation is not of itself criminal, and it becomes so only by being accompanied with a fraudulent intent, which is the substance of the crime. *Commonwealth v. Jeffries*, 7 Allen (Mass.) 548 (83 Am. Dec. 712). The pretense must be false and made with the design of obtaining the money or property, and it must appear that the money or property was paid or received in consequence of the false pretense. *Bowler v. State*, 41 Miss. 570. The pretense, to

be criminal, must relate to a past event or a present existing fact, and the party injured must have believed the pretense to be true, and in reliance thereon must have parted with the money or property."

In discussing the element of actual fraud at another place in the opinion, the court said (at page 194):

"An essential element of the offense, under our statute, is that the person who parts with his property is in fact defrauded to his injury. In addition to false pretense, there must be an intent to defraud. The pretense must be used for the purpose of perpetrating the fraud, and the fraud must be actually accomplished by means of the false pretense. The false pretense that the defendant had money in the bank with which to pay the check, where there was no money, and he had no reason to believe the check would be paid, constituted a fraud upon Dickinson. It cannot be contended that Dickinson made the defendant a loan of the money, and that therefore, if the defendant was solvent, Dickinson was not defrauded. The transaction was not a loan, or intended to be a loan. He did not ask to borrow money from Dickinson, but, by the giving of the check, represented to Dickinson that he had the amount of money which he received on the check on deposit in the bank on which it was drawn. Dickinson was not buying a chose in action. The whole transaction was to the effect: 'Let me have $50. Here is a check on a bank in which I have on deposit that amount of money, which is yours, and which you will receive upon presenting the check to the bank.' Dickinson accepted the check and parted with his money on the pretense, made by the defendant, that by the check he set apart a special fund in the bank for the use of Dickinson. Dickinson did not accept the check upon the faith of defendant's solvency, or upon the thought that defendant might, by civil action, be compelled to pay the money represented by the check. Defendant obtained the money from Dickinson by a false pretense in this, that, by the giving of the check to Dickinson, he represented falsely that he had the money in the bank on which the check was drawn to meet the check when presented. It appears that he had no money in the bank, and no reason to believe that the check would be paid when presented at the bank. This involved a false pretense and a fraudulent intent. The draft

was taken as an equivalent for money.   See *State v. Decker,*
36 Kan. 717, 14 Pac. 283.

"In the case of *State v. McCormick,* 57 Kan. 440, 46 Pac.
777, 57 Am. St. Rep. 341, a case in which the defendant ob-
tained a horse from the prosecutor and delivered to him a
check in payment therefor, the supreme court of Kansas said:
'Fritz was not trading his horse for a mere chose in action,
nor for the right to bring a lawsuit against the defendant,
. . . but rather was selling it for money supposed to be
set apart by and subject to the check.'

"In that case it was claimed that, if the defendant was
solvent, the prosecutor could not have been defrauded by
accepting his check, but the court said this was not sound;
that the draft was not what it represented to be, was not
drawn upon an actual bank, nor for money belonging to the
drawer, or subject to the payment of the draft; that it was
a fraud upon the owners to attempt to procure their prop-
erty, without delivering to them just such a draft as it was
represented to be; that they wanted a draft which was the
equivalent of money, and were not purchasing a lawsuit."

So in this case, the shares of capital stock which Groff
received were not what they were represented to be.   He
parted with his money upon the faith of the representation,
among others, that the Florence-Rae Lumber, Land and De-
velopment Company was the owner of fourteen hundred acres
of timber land with the standing timber thereon, in Snoho-
mish county, Washington; that the timber consisted of many
millions of feet and was worth many hundreds of thousands
of dollars.   He was expecting to receive five hundred shares
of the capital stock of a company possessing such assets.   It
is alleged in the indictment that the company did not own
any timber land or standing timber in Snohomish county.
Obviously Groff failed to receive that for which he bargained.
With what reason, therefore, can it be said that he was not
actually defrauded?   As in the *Foxton* case, he did not buy
a mere chose in action or a lawsuit, nor did he loan the com-
pany $500 expecting its return.   The mere fact that, if the

company is solvent he may be able to recover his money, does not render him any the less defrauded in the eyes of the law. In that event, he may be defrauded of less, but he would nevertheless be defrauded.

We have examined all of the Iowa cases cited by counsel and many others, and none of them seem to militate against the holdings in the cases to which we have referred. In the light of the provisions of the foregoing statute and the decisions to which we have referred, we are unable to say that the indictment under inspection does not substantially charge a crime under the laws of the state of Iowa.

The judgment is affirmed, and relator, who is now in custody of the sheriff of Thurston county, will be surrendered to the agent of the state of Iowa in compliance with the warrant of extradition issued by the governor of Washington.

ELLIS, C. J., MOUNT, CHADWICK, FULLERTON, and PARKER, JJ., concur.

MORRIS and MAIN, JJ., took no part.