[No. 27718. Department One. January 6, 1940.]

THE STATE OF WASHINGTON, *Respondent,* v.
B. W. SARGENT, *Appellant.*[1]

[1]Reported in 97 P. (2d) 692; 100 P. (2d) 20.

*John J. Wrabeck*, for appellant.

*Ralph E. Foley* and *Harvey Erickson*, for respondent.

Robinson, J.—The appellant was convicted of larceny as defined in Rem. Rev. Stat., § 2601 [P. C. § 8944], subd. (2). He contends on appeal (1) that the information did not charge a crime; and (2) that, in any event, the state's evidence was not sufficient to prove the allegations of the information. The applicable portions of § 2601 read as follows:

"Larceny. Every person who, with intent to deprive or defraud the owner thereof— . . .

"(2) Shall obtain from the owner or another the possession of or title to any property, real or personal, by color or aid of any order for the payment or delivery of property or money or any check or draft, knowing that the maker or drawer of such order, check or draft was not authorized or entitled to make or draw the same, or by color or aid of any fraudulent or false representation, personation or pretense or by any false token or writing or by any trick, device, bunco game or fortune-telling; or . . .

"Steals such property and shall be guilty of larceny."

The charging part of the information reads as follows:

"That the said defendant, B. W. Sargent, in the county of Spokane, state of Washington, on or about the 2nd day of July, 1935, then and there being, did

then and there wilfully, unlawfully and feloniously, with intent to deprive and defraud the owner thereof, obtain from James E. Marion personal property, to-wit: 50,000 shares of Independence Lead Mining stock, of the value of $4500, and the property of and belonging to the said James E. Marion, by color and aid of certain false and fraudulent representations and pretenses, to-wit: by then and there representing and pretending that the Sunshine mining vein was within 400 feet of the Globe Silver Property, and that a strong financial company in New York had agreed to take a large block of Globe Silver stock, and that if the said James E. Marion would exchange his 50,000 shares of Independence Lead Stock for 50,000 shares Globe Silver stock, that he, the said defendant, would get the said 50,000 shares of Globe Silver stock included in the block of stock which the said New York financial company would handle, and the said James E. Marion would receive 30¢ a share or $15,000 in a few days; and the said James E. Marion, relying on said false and fraudulent representations and pretenses, delivered the said 50,000 shares of Independence Lead stock to the said B. W. Sargent in exchange for 50,000 shares of Globe Silver stock; whereas the said representations and pretenses made by the said B. W. Sargent were false and known by him to be false at the time of making them, and the said B. W. Sargent not having been a resident of the state of Washington since February 1, 1936."

Reduced to its lowest terms, the information charges that Sargent obtained from Marion 50,000 shares of Independence Lead Mining stock by color and aid of certain false and fraudulent representations and pretenses, to-wit:

(1) By falsely representing and pretending that the Sunshine Mining vein was within four hundred feet of the Globe Silver property;

(2) By falsely representing and pretending that a strong financial company in New York had agreed to take a large block of Globe Silver stock; that he was

in a position to have 50,000 shares of Globe Silver stock included in the block; and, if Marion furnished such stock, he would receive thirty cents per share for it, or fifteen thousand dollars, within a few days.

Sargent proposed to supply Marion with the necessary 50,000 shares of Globe Silver in exchange for Marion's 50,000 shares of Independence Lead. Marion, relying upon the false representations and pretenses, delivered the Independence Lead stock to Sargent, and so it is charged that Sargent obtained "from the owner . . . the possession of . . . property . . . by color of . . . fraudulent or false representations . . . or pretense . . . "

It will be noted that there is no allegation that Marion was defrauded, in the sense that he suffered any pecuniary loss. For aught that is charged, he may even have gained by the transaction. The appellant urges that this vitiates the information; but, as we read the statute, the gist of the offense is obtaining property from an owner by the use of false and fraudulent representations or pretenses, and whether or not the owner suffered a pecuniary loss is immaterial. *State v. Miller,* 212 Mo. 73, 111 S. W. 18; *People v. Bryant,* 119 Cal. 595, 51 Pac. 960; *People v. Bartels,* 77 Colo. 498, 238 Pac. 51.

This court, speaking through Judge Webster, said, in *In re Rudebeck,* 95 Wash. 433, 163 Pac. 930:

"Considerable confusion has arisen because of the fact that, in enumerating the constitutent elements of the crime of obtaining money by false pretenses, the cases frequently declare that the owner must have been actually defrauded. *But this expression does not imply that he must have suffered actual pecuniary loss.* The failure to appreciate this distinction has been the cause of most of the misunderstandings, and has resulted in apparent rather than real conflict in the cases. *The owner is actually defrauded when he parts*

*with his property or money and fails to receive in ex-change that for which he bargained.* When the ac-cused falsely represents to the owner that he is to receive in exchange for the money and property ob-tained from him a particular thing, and instead he re-ceives another and entirely different thing, he is, in legal contemplation, actually defrauded." (Italics ours.)

Concerning the point in question, it is said in 25 C. J. 608:

"False Pretenses [§ 38] 9. Loss to Prosecutor. While the statutes do not in express language require that the person from whom the property is obtained should be defrauded thereby, but only that it is obtained with intent to defraud him, nevertheless it is held as a general rule that the crime is not committed unless the prosecutor is in fact defrauded. *Hence, as a rule, the crime is not committed if the prosecutor gets out of the transaction just what he bargained for. Except under a few statutes it is not necessary to constitute an offense that the prosecutor has or will necessarily suffer actual pecuniary loss.* If he has been placed by the fraud of the accused in such a position that he may eventually suffer loss, or if he does not receive for the money or property parted with the thing promised by accused, even though he receives some-thing else, regardless of whether such thing received is of equal value, less value, or no value at all, it is sufficient. Under the rule that actual loss is not neces-sary, it is no defense that the prosecutor has recovered, or may eventually recover for any loss sustained. Nor is the accused relieved from criminal liability, even though the person defrauded may eventually make himself whole in some mode not contemplated at the time he parted with the property." (Italics ours.)

■ It will be noted that it is pointed out in both of the foregoing quotations that a crime is not committed if the person from whom the property is obtained gets in exchange what he bargained for. It is contended that the information shows on its face that Marion got

exactly what he bargained for; that is, 50,000 shares of Globe Silver stock, and, therefore, that the information does not state a crime. We cannot agree with this contention. Marion bargained for something more than that, to-wit: (1) Stock in a mine located within four hundred feet of the Sunshine Mining vein; (2) stock that Sargent was in a position to have included in a large block which a strong financial company in New York had agreed to market; and (3) for which, as a result, Marion would receive thirty cents per share, or fifteen thousand dollars, within a few days.

It is further contended that to charge that it was represented to Marion that he would receive thirty cents per share for the stock is merely to allege that Sargent stated an opinion or engaged in "seller's talk" or made a prophecy as to the future course of the market. But the charge goes far beyond that. It is charged that appellant made certain representations of fact which, if true, would render the predicted result probable; those factual representations being (1) that a strong financial company in New York had agreed to take a large block of the Globe stock, and (2) that Sargent was in a position, and had the ability, to include the 50,000 shares in that block, and that these factual representations were false. The allegation that Sargent represented that the New York company had entered into the agreement is, as distinguished from a prediction, a factual representation upon which Marion might reasonably rely. The allegation that Sargent represented he had the ability to get the 50,000 shares included in the transaction is another. *State v. Parkinson,* 181 Wash. 69, 41 P. (2d) 1095. The representations were of such a character as to reasonably induce Marion to part with his stock in the belief that, by so doing, he would get fifteen

thousand dollars within a few days. The information was clearly sufficient.

It is insisted that the crime charged was not proven. The evidence shows that Marion was a retired farmer. In May, 1935, appellant Sargent attempted to sell him some Independence Lead Mining stock. Marion, responding to Sargent's salesmanship, sold nine hundred shares of Sunshine and purchased 150,000 shares of Independence Lead. No complaint is made of this transaction, although it turned out to be improvident. In July, Sargent came back. We quote excerpts from Marion's testimony, none of which was in any way disputed. It is not quoted in the exact sequence in which it was given, the various excerpts being slightly rearranged in order to present a continuous and chronological narrative:

"Q. What did he say when you first saw him? A. He first twitted me about not answering a phone call that he put in to get me a day or two before that. Q. Then what did he say? A. Then he said he was in a hurry, he was going to take an airplane for New York that afternoon. . . . Q. What else did he say then? A. He said if I would trade 50,000 Independence for 50,000 Globe he could make up for the loss I had suffered through him on Independence. Q. What was your loss on Independence on July 2nd or 3rd, 1935? A. About $5,000. . . . Q. What did he say with reference to that loss that you had sustained there? A. He said if I would trade that he would overcome that loss. Q. What did he say you would make out of this trade? A. He said he would give me thirty cents a share. Q. For what? A. For the Globe stock. And this was in a few days. He would wire me from New York when to put it in the bank at Fairfield and I was to put that stock in there and get my money. . . . Q. What did Sargent tell you about this financial house in New York? A. He said it was a strong financial company and they had agreed to take over a large block of Globe Silver stock,

and he would get this 50,000 shares of Globe included in that block. . . . Q. Did he say anything with reference to the distance from the Sunshine? A. He said the Globe Silver adjoined the Sunshine and had less than 400 feet to get to the Sunshine vein and they was liable to strike high grade ore at any time. Q. Did he say it was 400 feet from the Globe tunnel to the Sunshine shaft, or what— A. No, he just said about 400 feet to go to get to the Sunshine vein. . . . Q. Did you get 50,000 shares of your Independence stock for him, or not? A. Yes. My stock was up where my father lived, about 400 feet from there, and I went up there and got the stock. Q. What induced you to do this? Why did you do it? . . . A. On account of getting thirty cents a share for the stock in a few days. Q. You were going to trade this because you would get thirty cents a share for the stock in a few days? A. Yes. Q. Did any other representation that he made induce you to do this? A. Well, the mine one, where it was located in the statement, finding that rich ore in the Sunshine vein. Q. Did the statement it was within 400 feet of the Sunshine cause you to be influenced? A. Yes; but the thirty cents was the main one I was thinking of. Q. How many shares of Independence stock did you turn over? A. 50,000 shares. Q. Where did you endorse it over to Sargent? A. In front of where my father lived. He give me his fountain pen and I signed it right on his knee. Q. Did you hand it to Sargent? A. Yes."

Several days thereafter, Marion received a confirmation from W. V. Stenton & Company, dealers in securities, Hyde Building, Spokane, of 50,000 shares Globe Silver Mines, in even exchange for 50,000 shares Independence Lead, and, in due course, the Globe Silver stock certificates. He was never notified to take the stock to the Bank of Fairfield and receive money therefor.

Two mining engineers were called, who testified that, from the Jewell shaft, which is at the apex of the Sunshine vein, it was about thirty-six hundred feet,

on the surface, to the Globe Silver vein, and about twenty-two hundred feet from the Jewell shaft to the property line of the Globe Silver. There is another known vein on the Sunshine property which is, on the surface, about thirteen hundred feet from the Globe property line, and there may be undiscovered veins on the Sunshine property which are still nearer to the Globe property, but the words "Sunshine Mining vein" were universally understood to mean the developed vein from which immense quantities of ore were being taken out through the Jewell shaft.

Mrs. Robert Bull, formerly Elma Seavert, testified that, in July, 1935, she was employed by W. V. Stenton & Company, the exclusive fiscal agents of Globe Silver Mines, and had complete charge of its office and the records of all its transactions; that Stenton & Company had no arrangement or deal with any New York financial house at that time for the taking over of a large block of Globe stock; that Sargent was not an officer of the Stenton company, and she had not seen him in the office more than four or five times. She conceded that he may have been employed by the Stenton company as a salesman.

Sargent did not take the stand in his own behalf, and but one witness was called by the defense. He testified that he sold 50,000 shares of Independence Lead for the account of W. V. Stenton & Company between the 3rd and the 15th of July, 1935, and gave the prices received on such sales. This was the identical stock received by Sargent from Marion. This witness was also interrogated as to the market price of Globe Silver at that, and subsequent, times. Apparently, he was called solely in an attempt to prove that Marion sustained no financial loss on account of the trade, a matter which we hold to be immaterial.

It seems unnecessary to analytically discuss the

state's evidence, the material parts of which have been above set out. In our opinion, it was clearly sufficient to warrant a jury in finding the defendant guilty as charged.

The judgment and sentence appealed from is affirmed.

BLAKE, C. J., BEALS, SIMPSON, and MAIN, JJ., concur.

ON REHEARING.

[*En Banc.* March 14, 1940.]

PER CURIAM.—Upon a rehearing *En Banc,* a majority of the court adheres to the Departmental opinion heretofore filed herein.

MILLARD, J., dissents.

[1]Reported in 97 P. (2d) 696.