[No. 32260. *En Banc.* July 29, 1953.]

THE STATE OF WASHINGTON, *Respondent*, v. RUSSELL SAGE EMERSON, *Appellant.*[1]

[1]Reported in 259 P. (2d) 406.

*Russell Sage Emerson, pro se.*

*Charles O. Carroll* and *F. A. Walterskirchen,* for respondent.

SCHWELLENBACH, J.—This is an appeal from a judgment and sentence for grand larceny, upon a verdict of guilty by a jury.

At the outset, we wish to state that we have experienced some difficulty with the record because of the many changes of attorneys. The defendant was originally represented by John Wesley Dolby. Dolby was discharged by the defendant, and J. Edmond Quigley represented him during the trial. After the verdict, Mr. Quigley was discharged and the defendant employed Paul M. Stocker and Stanley L. Conroy, who argued a motion for new trial, and prepared the brief on appeal. They were later discharged, and the defendant presented the oral argument before this court.

Defendant was charged with grand larceny in five separate counts, each count involving different individuals. We quote count I (the others are similar):

"He, the said RUSSELL SAGE EMERSON, in the County of King, State of Washington, during the period from on or about the 2nd day of May, 1950 to on or about the 30th day of May, 1950, with intent to deprive and defraud the owners thereof, willfully, unlawfully and feloniously did obtain from Thomas A. West and Ruth H. West, husband and wife, personal property of a value in excess of $25.00, to-wit: the sum of $465.00 in lawful money of the United States, the property of the said Thomas A. West and Ruth H. West, by color and aid of false and fraudulent representations, pretenses, trickery, scheme and device, to-wit: by representing and pretending that he was a capable residence construction contractor, that he could secure a loan to finance the con-

struction of a residence for said Thomas A. West and Ruth H. West, that the sum of $465.00 was necessary to pay for architects fees and services, blue prints and specifications, and cost of getting bids on sub-contracts, that the architects fee was $250.00; relying upon said false representations, pretenses, trickery, scheme and device, Thomas A. West and Ruth H. West, husband and wife, turned over to the defendant RUSSELL SAGE EMERSON the sum of $465.00 in lawful money of the United States, and the said defendant did then and there receive and obtain said property, with the understanding that he would safely hold, keep and maintain said property for the said owners thereof, as bailee, agent and trustee thereof and to use said property to pay the architects fees including blue prints and specifications, and the costs of getting bids on subcontracts, and the said defendant RUSSELL SAGE EMERSON, having received the said property as aforesaid, did then and there willfully and unlawfully and feloniously, with intent to deprive and defraud the owners thereof, secrete, withhold, appropriate and convert the same to his own use;

"Contrary to the statute in such case made and provided, and against the peace and dignity of the State of Washington."

At the close of the state's case, the trial court dismissed counts II, III, and IV, and also eliminated all allegations of the other two counts except as to architect's fees. He stated:

"The defendant is now accused in count I of obtaining the sum of $465 from Thomas A. West and Ruth H. West, his wife by falsely representing that the architects fee was $250. As to Count V, he is charged with obtaining $325 from David A. Palumbo by falsely representing that the architect's services was the sum of $250."

The Wests contacted the defendant in response to an advertisement he had inserted in a newspaper. After a couple of interviews, the following agreement was entered into:

"RUSSELL EMERSON
1309 Aurora     GA. 0183
BUILDING AGREEMENT

"I, Russell Emerson, construction Supervisor, hereinafter called SUPERVISOR, do hereby propose to procure blue prints, sub-contract bids and supervise construction of a residence for Mr. & Mrs. Thomas West, hereinafter called OWNER, to be located at N ½ L 38 all 39-40 & 41 B 4 Cascade Add.

Following is a description of said proposed house: Living room, 2 bedrooms, kitchen with eating space, full basement, frame construction, automatic oil burner, Fireplace, plans drawn by Architect to Owner's specifications.

"Supervisor agrees to produce house for Owner at cost of sub-contract bids on labor and materials with added service fee of Fifty Dollars ($50.00) weekly for ten weeks supervision.

"During construction Supervisor's duties shall consist of (a) ordering of all materials such as lumber, concrete, etc.; (b) ordering of bulldozer on job and hiring of competent workmen; (c) synchronize arrival on job of all sub-contractors such as electricians, plumbers etc.; (d) inspect and order corrected any work not done according to blue prints and specifications; (e) reject and re-order any materials of inferior grade that may appear on job; (f) instruct and advise Owner in any work such as painting, rock-lathing, sub-flooring, etc. that he may wish to do himself; (g) present Owner each week with a list of bills on labor and materials due.

"A payment of $465.00 to Supervisor is hereby acknowledged to cover cost of Architectural fees, services to include planning of house with Owner, finished blue prints and specifications at F.H.A. standards or better; cost of getting list of bids on sub-contracts and (owner has survey)

"Owner agrees that for a period of three months after house is completed and occupied Supervisor shall be priviledged to show house to at least two prospective home-builders during that time. Upon request, Owner agrees to state cost of house to prospective builder and terms of construction.

"Signed and dated this 2nd day of May 1950.

"[Signed] THOMAS A. WEST        paid $240.00 on
         RUTH H. WEST           account. Balance
         RUSSELL EMERSON        $225.00 due when
paid in full total of          sketches by
$465.00                        architect approved.
[Signed] Russell Emerson          Russell Emerson"

The Palumbo contract was identical, with the exception that the amount paid down was $325. There were no payments of fifty dollars weekly for supervision, since neither house was constructed.

The Wests and Palumbo testified that Emerson told them the architect's fee would be $250; that no part of the down

payments were to go to him personally; that all that he was to realize was the fifty dollars per week for supervision.

A. Eugene Fulton and Lawrence MacDonald, architects, testified that, prior to the time defendant contacted the Wests and Palumbo, they had an understanding with him that they were to make plans and specifications for homes for $150 apiece, and that they charged him $150 each for the plans; that their usual fee for this work was $250, but, because of the volume of business which he brought in (twenty-two plans by Fulton, two homes being completed), coupled with the fact that he did some preliminary work, they were able to reduce the charge for each set of plans. Mr. Fulton testified that one of the considerations in giving defendant the lower price was the volume of business coming to him. Defendant's sketches and preliminary work were not of sufficient detail and accuracy to permit the architects to go ahead with the plans.

The defendant testified that he made no representation to the Wests or Palumbo, at the time the contracts were signed or the money paid to him, as to the amount to go to the architect; that it was some time later, after they had experienced difficulty in obtaining loans, that they came and told him they had contacted the architects and had learned that he had an agreement with the architects to pay only $150 for each set of plans; that he explained to them that he obtained a reduction in price because he did part of the work on the plans; that a Mr. Ikonen helped him do the sketching and that he paid Ikonen three hundred dollars per month. He admitted writing to Frank Harrington, deputy prosecutor, "Mr. West originally paid me four hundred sixty-five dollars ($465.00) in cash. Before receiving this money I told him the price of my procuring blue prints for him would be $250.00, and both he and his wife agreed to this sum."

Appellant makes the following assignments of error:

"1. That the court erred in refusing to dismiss what remained Counts I and V against appellant because there is no evidence whatsoever in the Statement of Facts that any false representation as to a material fact made by appel-

lant, if such was made, was made prior to the time of the entry of the parties into the contract herein or prior to the time of delivery of the money; and, therefore, that said Wests or Palumbo did not act because of false representations or were not induced to turn over the money to Emerson by false statements or false representations.

"2. That the court refused to give appellant's proposed instructions relating to Remington's Revised Statutes, Section 2608 under Claim of Title when same is ground of defense. That said proposed instruction was as follows:

"INSTRUCTION No. 6

"The laws of the State of Washington provide that, in any prosecution for larceny, it shall be a sufficient defense that the property was appropriated openly and avowedly under a claim of title preferred in good faith, even though the claim is untenable. Therefore, if you find from the evidence that the defendant withheld or appropriated to his own use the property or money described in the information, that he did so openly and avowedly under a claim of title preferred in good faith, that is, honestly believing that he was legally entitled to it as his own, then your verdict should be not guilty.

"3. That any information given by appellant to the Wests or Palumbo regarding the value or price of architectural fees was merely an expression of an opinion and not the statement of an existing or past fact, but contingent upon future events. That if there was a representation made by appellant false in nature, there is no evidence that the same was relied upon by the complaining witnesses. That the court erred in holding that there was sufficient evidence to take the case to the jury, and denying motion for new trial."

We quote the portions of the larceny statute (RCW 9.54.010) pertinent to our inquiry:

"Every person who, with intent to deprive or defraud the owner thereof— . . . (2) Obtains from the owner . . . the possession of . . . any property, real or personal, by color or aid of . . . any fraudulent or false representation, . . . pretense . . . or by any trick, device, . . . steals such property and shall be guilty of larceny."

Instruction No. 2, setting forth the elements, was as follows:

"In order to convict the defendant of the offense of grand larceny as charged in count I of the amended information,

the state must prove to you beyond a reasonable doubt each of the following essential elements:

"1. That in approximately the month of May, 1950, the defendant did obtain from Thomas A. West and Ruth H. West, his wife, the sum of $465 in lawful money of the United States;

"2. That defendant did so obtain said money or a portion thereof in excess of $25 with intent to defraud the said Thomas A. West and Ruth H. West thereof by making a false and fraudulent representation, to-wit: that the sum of $250 of said funds would necessarily have to be paid as an architect's fee;

"3. That at the time said representation was made, defendant knew the same to be false, and that in fact such representation was false in that said architect's fee would be a lesser amount as defendant well knew;

"4. That Thomas A. West and Ruth H. West both relied upon said representation and solely because thereof delivered said sum to the defendant, and that had such representation not been made and so relied upon the said Thomas A. West and Ruth H. West would either not have delivered said sum of money at all, or would have delivered said sum of money in an amount over $25 less than $465;

"5. That said act so occurred in King County, Washington."

Instruction No. 3, as to count V, was similar.

When the trial court struck certain allegations of counts I and V, appellant consented thereto by presenting his testimony. No motion to dismiss was made at the close of the entire testimony.

There was a sufficient conflict of testimony as to the time of the making of the purported false representations to warrant submission of that question to the jury. There is no merit in assignment of error No. 1.

■ Proposed instruction No. 6 was manifestly based on RCW 9.54.120, which provides that in any prosecution for larceny it shall be a sufficient defense that the property was appropriated openly and avowedly under a claim of title preferred in good faith, even though the claim be untenable. The trial court, in striking certain portions of counts I and V, took from the consideration of the jury the question as to whether or not appellant *appropriated* the money to his

own use. At no time during the trial did the defendant contend that he made a claim of title to the money *at the time that he received it* from the Wests and Palumbo. The crime of larceny by false pretenses was complete at the time that the Wests and Palumbo parted with their money in reliance upon the false representations which had been made with the intent to deprive them of their money.

A false representation of a material fact, made for the purpose of inducing another to part with his property and with the intent to deprive him of his property, is inconsistent with any open and avowed claim of title preferred in good faith; and the defense allowed by the statute is unavailable in a prosecution for obtaining money by false pretenses.

■ The witnesses testified that appellant stated to them, *as a fact,* that the architect's fees would be $250. At that time, he had an agreement with the architects that the fee would be $150, and that is the amount he paid them for each set of plans. These statements were not merely the expression of an opinion contingent upon future events. In *State v. Parkinson,* 181 Wash. 69, 41 P. (2d) 1095, we said:

"While the particular language used by one in a given instance may, under one set of circumstances, be expressive of an opinion only, it may, under another set of circumstances, be taken as an expression of fact. If a representation regarding one's authority or ability to accomplish a certain result be made by one who occupies, or claims to occupy, a position or relation which apparently enables him to dictate, control or effect such result, then such representation will be regarded as an expression of fact."

■ The contract which appellant induced the Wests and the Palumbos to sign was adroitly drawn. He told them that all that he was to realize was the fifty dollars per week for supervision, and that no part of the down payments were to go to him personally; that included in the down payments was the sum of $250 for architect's fees. The testimony of the witnesses regarding appellant's dealings with them, and appellant's testimony on the witness stand, would indicate

that he was a "smooth talker." The Wests and Palumbos were not educated people. They had had no business experience along these lines and were vitally interested in building homes for themselves. The question as to whether or not they believed appellant's representations concerning the cost of architectural fees, and, in reliance thereon, were induced to part with their money, was properly submitted to the jury. Underhill's Criminal Evidence (4th ed.) 1318, False Pretenses § 703; 22 Am. Jur. 459, False Pretenses, § 26.

The record does not contain a motion for a new trial. Nevertheless, respondent admits that such a motion was filed by Mr. Quigley and that it included therein the ground "That the verdict is contrary to the law and the evidence." However, at the hearing on the motion, appellant's then counsel waived all other grounds and relied solely upon misconduct of jurors. This was based on an affidavit of one Ellen Haehnel that, during a noon recess of the trial, she had heard one juror tell other jurors of a telephone conversation whereby he learned the defendant was a robber and a murderer. There was also an affidavit by the defendant that he had been informed of the conversation by Mrs. Haehnel; that he had not intended taking the witness stand, but that because of such information he deemed it necessary to take the stand; that the result of the conversation and his taking the witness stand created such prejudice that he was not afforded a fair and impartial trial.

The trial court conducted an extensive hearing on these charges. A juror denied that there was any conversation among the jurors concerning the defendant's criminal record. It also developed at the hearing that some woman had called a couple of jurors on the telephone one evening, stating that she was one of the fellow jurors, asking them what they thought about the trial, and whether or not they thought the defendant was guilty. At the conclusion of the hearing, the trial judge denied the motion for new trial and stated that, in his opinion, Mrs. Haehnel committed perjury.

14

■ In his oral argument before this court, appellant abandoned the grounds presented in the brief and urged a new trial on other and new grounds which were outside of the record. An appeal must stand or fall on the record made in the trial court.

Appellant was effectively and vigorously defended by Mr. Quigley. The trial court was patient, fair, and alert at all times to protect appellant's rights. We find no error in the record.

The judgment and sentence is affirmed.

MALLERY, HILL, DONWORTH, WEAVER, and OLSON, JJ., concur.

GRADY, C. J. (dissenting)—I am not in accord with the majority opinion either with respect to the procedural matters referred to or the conclusion that any act of appellant violated subdivision 2 of RCW 9.54.010. It is my view the evidence submitted by respondent not only failed to prove the existence of any fact creating a question for the jury to determine, but affirmatively established that, as a matter of law, the statute was not violated.

With reference to procedural questions, respondent contended in its brief and upon oral argument that appellant did not lay the necessary foundation either at the trial or upon his appeal to enable this court to review the record, in that he (1) took no exception to the ruling of the court denying a challenge to the sufficiency of the evidence to sustain the charge in count I of the information, (2) made no challenge at any time to the sufficiency of the evidence to support count V, and (3) made no challenge or motion of any kind at the close of all of the testimony. Respondent further contended that, by becoming a witness in his own behalf, appellant waived his challenge to the legal sufficiency of the evidence, and that counsel waived his claim that the verdict was contrary to law and the evidence.

Under our trial practice, it is not necessary to take an exception to a ruling or decision made by the court during the course of a trial in order that a claim of error may be considered by the trial court, or by this court on appeal, un-

less it is so provided by statute or rule of court. RCW 4.80.050.

Appellant at the close of respondent's case in chief challenged the legal sufficiency of the evidence directed to all counts in the information. The challenge was argued at length, and the court sustained it as to counts II, III, and IV, and in part to counts I and V. No challenge to the legal sufficiency of the evidence was made at the close of all of the testimony, but one was made before the entry of judgment and sentence in the form of or as part of a motion for a new trial. This part of the motion was "that the verdict is contrary to the law and the evidence." Upon the principle recognized in *State v. Hyde*, 22 Wash. 551 (563), 61 Pac. 719, the trial court should have treated such part of the motion as one in arrest of judgment, and we should now do so on this appeal.

I do not agree with the claim made that appellant waived his challenge to the *legal* sufficiency of the evidence made at the close of respondent's case by not standing on the same and declining to proceed further with the trial. I base my view upon an exception to the general rule recognized in *State v. Brown*, 178 Wash. 588, 35 P. (2d) 99. In that case, we quoted from 16 C. J. 938, Criminal Law, § 2305, as follows:

" 'Although there is authority to the contrary, as a general rule a motion for a directed verdict, made at the close of the case for the prosecution and overruled, is waived by defendant proceeding with the trial and introducing evidence, *unless the evidence introduced has no bearing on the merits of the case.*' " (Italics mine.)

I emphasize the exception to the general rule, which works out in this way: The state may submit evidence in support of a charge which may be *legally* insufficient to establish the charge made. A challenge on that ground is not a motion for a nonsuit as in civil cases. If such challenge is well taken, the defendant is entitled to the relief prescribed in *State v. Hyde, supra.* If the challenge is denied, a defendant may stand thereon and offer no evidence, or he may proceed with the trial; if he does the latter, he may adduce evidence

either by himself or his witnesses which will supply the deficiency—that is a chance he takes. But if the situation as it existed at the time the state closed its case is not changed, the exception to the general rule applies, there is no waiver of the original challenge, and he may urge error with reference thereto on appeal. When considering this question and what is said in opinions of the courts, one should have in mind the difference between the *legal* sufficiency of the evidence to establish a crime charge and the factual sufficiency thereof; and when this is done, the general rule and its exception are not difficult to apply to a given situation.

I find nothing in the record that added anything to respondent's case in chief. The challenge later made had equal basis for its support that previously existed.

I find no merit in respondent's claim that counsel for appellant waived the legal right he had acquired when no legal evidence had been adduced to establish the charges made in counts I and V of the information. If anything was waived, it was only those parts of the motion for a new trial relating to matters discretionary in the court or to matters factual, or a claim that the evidence was not sufficient to satisfy beyond a reasonable doubt, or that the presumption of innocence had not been overcome, or that substantial justice had not been done, and matters of like character. The part of the motion which should have been treated by the trial court and which we should now treat as one in arrest of judgment, involved no element of discretion; if well founded in law, it involved a matter of right.

It is my view that the assignments of error "the court erred in refusing to dismiss what remained of counts I and V against appellant . . ." and "that the court erred in holding there was sufficient evidence to take the case to the jury . . ." are sufficient under our rules to entitle appellant to a review of the questions whether the trial court erred in not sustaining the challenge to counts I and V and in not arresting judgment.

The appellant was charged by five counts in the information with violating RCW 9.54.010. The court dismissed

counts II, III, and IV at the close of respondent's case. Counts I and V were limited to a single issue. The original charge was in a double aspect—one being a charge of obtaining money under false pretenses by three different representations, and the other being a charge of embezzlement. By statute, the crime of larceny may be committed in either way. At common law and by statutes prior to the enactment of the criminal code in 1909, the two were separate and distinct offenses. They are necessarily so treated under our present statute upon the trial of a case, for the reason that in the former money is wrongfully obtained by the defendant from the complainant by some false pretense; while in the latter case (embezzlement) he acquires the money rightfully in the capacity of an agent, bailee, trustee, etc., and then appropriates the same to his own use.

Respondent sought to prove the charges in counts I and V by the testimony of the Wests, Palumbo, the written contract between them and appellant, and the testimony of two architects. When respondent closed its case, appellant moved to require that an election be made between the two forms of statutory larceny and challenged the legal sufficiency of the evidence to establish either crime.

The discussion with the trial judge was lengthy and the whole field was explored. The trial judge at first was of the view that, if any charge against appellant had legal support, it was that of embezzlement. Respondent contended that its evidence established that appellant had obtained money from West and Palumbo by false representations. Appellant contended that neither charge had been established as a matter of law. The result was that the court eliminated the alleged pretenses that appellant was a capable residence construction contractor and one who could secure a loan to finance the construction of residences for West and Palumbo. The embezzlement charges were also eliminated. In addition to this, the court eliminated that part of the evidence by which it was claimed by respondent that West was given to "understand" and Palumbo was "told" by appellant that he would receive no part of

the money advanced by them to pay for the items mentioned in the information, including an architect's fee of $250. The limitation placed upon the information and the evidence in support thereof can best be gathered from the language of the trial judge as follows:

"I have a note here that he (Palumbo) testified that he was told (by Emerson) that the plans would cost $250."

"Now four and last representation 'that the architects fee was $250.00'. Now, the written contract that they signed merely said that for $465 he would produce plans, specifications and do these other things. It didn't say how much he would pay for each, but Mr. West testified that he told him before he got this money that $250 of this amount would be necessary to pay the architect. . . . And it seems to me that there is a factual question on that last misrepresentation sufficient to go to the jury on the theory did he represent to them that the architect's fee was 250. The testimony of the architect is that he had, he had an arrangement with him for a hundred and fifty dollars, and that he had made that arrangement at a date before he talked with the Wests. So at the time that he talked to the Wests, he had every reason to believe that the only thing he would pay out was 150, and did he represent 250 in the effort to obtain a greater amount of money from them than he otherwise would if he told the truth? It seems to me that is the only issue left in that count so far as the misrepresentation. . . .

"It seems to me again, as I said in the West case, unless this man is guilty of obtaining the money originally by the false representation by exaggerating the amount of architects costs, that he wouldn't be guilty of anything. . . . the case will go to the jury on counts I and V but on the sole theory of misrepresentation, *falsely exaggerating the architectural costs*." (Italics mine.)

The court was asked before the appellant proceeded with his case to inform the jury of the limitation placed upon the charges made in the information. The trial judge said to the jury:

"The defendant is now accused in count I of obtaining the sum of $465 from Thomas A. West and Ruth H. West, his wife, by falsely representing that the architects fee was $250. As to count V, he is charged with obtaining $325 from David A. Palumbo by falsely representing that the architect's services was the sum of $250."

I quote the foregoing excerpts from the remarks of the trial judge, as I deem them important in clarifying the confusion created by the respondent's evidence. I also quote from the Wests' contract referred to in the majority opinion, the following:

"A payment of $465 to Supervisor is hereby acknowledged to cover cost of Architectural fees, services to include planning of house with Owner, finished blue prints and specifications at F.H.A. standards or better; cost of getting list of bids on sub-contracts and (owner has survey)."

The testimony of the Wests and Palumbo relating to the limited charge was as follows:

Mr. West: "Q. Now pursuant to that contract, did you pay any money to Mr. Emerson? A. Four hundred and sixty-five dollars cash. Q. And was there a discussion with Mr. Emerson as to what that cash was to be used for, the purpose for which it was to be used? A. That was to start our house, that was for nothing else but to start our house, starting the construction of our house. Q. Was there any discussion at the time of signing that contract or prior to signing the contract about blueprints and— A. No; sir. Q. —architecture service? A. There was not. Q. All right. At the time of the signing of that contract, was there a discussion as to architects? A. I didn't get the question. Q. At the time of signing this agreement was there a discussion about blueprints and architects fees? A. Well, that was to come out of the money that we appropriated there. Q. the money you just mentioned? A. Yes, sir. Q. The $465? A. Yes, sir. Q. All right. Was there any discussion with Mr. Emerson as to how much the architects fees would be? A. Yes, sir, $250. Q. Procuring of blueprints? A. Or as to what the prints would cost us."

Mrs. West: "Q. In response to my question about an architect fee, I asked you if you recall or remembered any understanding about what the architect's fee was, and you then stated one hundred dollars. I want you to think back in your recollection and see if you can recall or refresh your recollection as to what the architect's fee, what Mr. Emerson represented to you that the architect had to be paid? A. Oh, $250. . . . Q. All right. Now, of this $465 after deducting the 250 for architect's fees, do you recall what the discussion of what the other portion of that was to be for? A. Well, the balance was supposed to be

spent to add onto the house, starting construction of the house. . . .

"Q. I want to ask you, Mrs. West, relative to your understanding of this contract, State's 1, after talking with Mr. Emerson is it your understanding that this 'supervisor agrees to produce house,' that clause there providing for a service fee of $50 per week, is it your understanding after talking with Mr. Emerson that there was to be no payment on that until such time as construction was under way? A. That's right. Q. All right. I want to ask you, first, with regard to the clause down here which says 'Payment of $465 to Supervisor is hereby acknowledged to cover cost of Architectural fees, services (and there is a comma there after Architectural fees) services to include planning of house with Owner, furnish blue prints and specifications at F.H.A. standards or better; cost (and then a semicolon) cost of getting list of bids on (some) subcontracts. . . .' was it your understanding after talking with Mr. Emerson that none of that money was to go to him personally for his own use? A. That's right. Q. And that from that money was to be paid the costs of the architect's fees, which included the planning of the house with the owner, the finished blue prints and specifications at F.H.A. standards or better, was it your understanding from Mr. Emerson that, that was to be $250, that is what he had to pay for it? A. That's right."

Mr. Palumbo: "Q. Now with regard to what has been admitted now as State's Exhibit 4, I want to ask whether with regard to the paragraph which reads: 'A payment of $325 (written above the sum of 500 crossed out) to Supervisor is hereby acknowledged to cover costs of Architectural fees, services to include planning of house with Owner, finished blue prints and specifications at F.H.A. standards or better; (and then a semi-colon, the) cost of getting list of bids on sub-contracts and survey of lot if Arichtect needs it.' Did you have a discussion with Mr. Emerson as to what specifically this $325 was to cover? A. Yes. Q. And will you just tell the jury what that was? A. Well, it was the $250 for architect's fees, and it was, it was $25 for the survey of the lot. And it was $50 for the permits. No, that was it, it was $50 for the costs of getting the bids, and the rest was—was $10 or so he had to get the permits to build the house. Q. All right. Now, was there any discussion with Mr. Emerson as to whether he, himself, was to get any of this $325 under any circumstances? A. No. Q. And what

did he say as to whether he was to get any of that $325? A. No, he wasn't supposed to be getting any of it. He was supposed to be getting $50 a week for ten weeks while the house was being built."

The architect (MacDonald) testified that the total charge for all acts and things done to secure sufficient blueprints and specifications was $250, but inasmuch as appellant did such part of the work for him as making preliminary sketches, interviewing the owner with him, obtaining for him the floor area, the number of rooms, the orientation of plans, information as to the type of lot, "and so on," and considering the fact that appellant furnished him with other business, he divided the charge of $250 with him so that he received from appellant $150 and appellant retained $100.

Much of the confusion that existed arose over the phraseology used when referring to the amount of money making up the costs to West and Palumbo of the plans. I again refer to the above-quoted provision in the contract with reference to architectural fees and what they included. In other instances, the words "architect's fee" were used, as well as words of similar import. The idea advanced was that when reference was made to the subject of architectural "fees" or "costs" it meant the amount of cash the architect *actually received* from appellant. Such thought overlooks the fact that the actual charge made for the plans was $250, of which amount the architect permitted appellant to retain $100 for doing part of the work and furnishing him a substantial amount of business. The idea was also sought to be conveyed that the fee of the architect was in fact $150 by the assertion of Mrs. West that she "understood" that none of the $465 advanced to appellant "was to go to him personally for his own use," and by the statement of Palumbo with reference to the item of $325, "No, he wasn't supposed to be getting any of it." Respondent wants the conclusion drawn that West and Palumbo, by reason of false representations, were induced to part with more money than they would have parted with had they known that appellant was to get any part of the $250 architectural costs;

but inasmuch as the court ruled out such a notion and limited respondent to its charge that appellant falsely exaggerated the costs of the plans, we have the latter question only for review.

Accepting the proof that appellant represented to the parties the plans would cost them $250 each, I find no evidence in the record that either the cost to them or the charge made by the architect was $150, or that either West or Palumbo was misled, or that they did not get what they actually bargained for, namely, plans to present to the FHA and the city of Seattle. The plans did cost them $250 each; there was no exaggeration of the cost of the plans and no deception practiced.

In a case of this kind, where one claims that in bargaining with another false representations are made by which he is induced to part with money, he is not cheated or defrauded in the sense contemplated by the statute if he gets in exchange for his money that for which he bargained. *In re Rudebeck,* 95 Wash. 433, 163 Pac. 930; *State v. Sargent,* 2 Wn. (2d) 190, 97 P. (2d) 692, 100 P. (2d) 20, and text authority therein cited.

This court has not had occasion to apply the statute to such a factual situation as is disclosed by the record, but we may look to the foregoing cases for statements of the principles involved affecting a charge of obtaining money under false pretenses. In those cases, we recognize the rule that a person is not defrauded in the sense contemplated by the statute unless he parts with his property or money and fails to receive in exchange that for which he bargained. In the *Sargent* case, we said:

"It will be noted that it is pointed out in both of the foregoing quotations that a crime is not committed if the person for whom the property is obtained gets in exchange what he bargained for."

Summarizing the situation disclosed by respondent's case, it seems very clear that West and Palumbo bargained for plans to present to FHA and the city of Seattle; that appellant represented to them that the architectural costs to

procure them would be $250 for each set of plans; that each party advanced to appellant a certain sum of money out of which would be taken the architectural costs; that by reason of the fact that appellant did some of the work for the architect and had furnished him some other business, he was allowed to retain $100 therefor in each case.

The legal conclusions necessarily to be drawn are that appellant at no time "falsely exaggerated the architectural costs;" that West and Palumbo received just what they bargained for, and that the statute upon which the information was based was not violated by appellant.

The judgment should be reversed, and the cause remanded with instructions to vacate the judgment and sentence and dismiss counts I and V of the information.

HAMLEY and FINLEY, JJ., concur with GRADY, C. J.

