[Nos. 27627-1-I; 27771-5-I; Division one. September 26, 1994.]
27829-1-I.

THE STATE OF WASHINGTON, *Respondent*, v. ROBERT LEE AGER, ET AL, *Appellants.*

844

Scott A. Reiman; Lenell Rae Nussbaum; Michael J. Trickey and *Appelwick, Trickey & Lukevich,* for appellants.

*Norm Maleng, Prosecuting Attorney,* and *John E. Bell, Deputy,* for respondent.

KENNEDY, J. — Robert Ager, Guy Jonas and Jean Jonas were charged with conspiracy among themselves and others to commit theft in the first degree during a period of time between January 1, 1981, and February 5, 1987 (count 1). In addition, Robert Ager and Jean Jonas were charged with committing theft in the first degree (embezzlement) during that same period of time (count 2) and Guy Jonas and Jean Jonas were charged with committing theft in the first degree (embezzlement) during that same period of time (count 3). Finally, all three Defendants were charged with knowingly exhibiting false accounts relative to the affairs of Life Insurance Company of America, with intent to deceive, during a period of time between December 1, 1985, and February 5, 1987 (count 4).

The original charging date was February 16, 1989. The amended information alleges that each of the embezzlement counts was based on a series of thefts closely connected with count 1 (conspiracy) and that the Defendants acted pursuant to a common scheme or plan and a continuous criminal impulse to embezzle moneys belonging to Life Insurance Company of America.[1]

In count 2 (embezzlement), it was alleged that Robert Ager and Jean Jonas as his accomplice unlawfully appropriated the following moneys belonging to Life Insurance Com-

---

[1] Thus, the State was required to prove that at least one charged criminal act, as each count and as to each Defendant, occurred on or after February 16, 1986, *i.e.,* within 3 years of the original charging date, but it could properly present evidence of a continuous course of charged criminal conduct dating back to January 1, 1981.

pany of America: (1) money in excess of Robert Ager's authorized salary and/or management fees; (2) money used to pay Robert Ager's personal obligations charged to the insurance company's credit cards and charge accounts; (3) money owed to the insurance company for interest due on notes/deeds of trust for personal loans owed to the insurer by Robert Ager.

In count 3 (embezzlement), it was alleged that Guy Jonas and Jean Jonas as his accomplice appropriated the following moneys belonging to Life Insurance Company of America: (1) all the same kinds of moneys listed above as to count 2; and in addition (2) money obtained from the insurance company pursuant to fraudulently generated annuity production bonuses.

This extremely complicated case has been tried twice so far. The first trial resulted in the conviction of Guy Jonas on count 4, exhibiting false accounts, and a "hung" jury as to all the other charges. At the second trial, which was held a few months later, all three Defendants were convicted of conspiracy and embezzlement and Robert Ager and Jean Jonas were convicted of exhibiting false accounts.

Robert Ager and Guy Jonas were given exceptional sentences (upward) of 54 months. Jean Jonas was given an exceptional sentence (upward) of 27 months. All three Defendants were ordered, jointly and severally, to pay restitution of $3.5 million.

Robert Ager appeals his convictions on all three counts, his exceptional sentence and the restitution order. Guy Jonas appeals his convictions for conspiracy and embezzlement,[2] his exceptional sentence and the restitution order. Jean Jonas appeals her conviction on all four counts and the restitution order. The Defendants raise a veritable lexicon of issues which we will identify and address (as necessary) in the course of this opinion.[3]

---

[2]None of Guy Jonas' assignments of error in this appeal relate to his conviction at the first trial for count 4, exhibiting false accounts.

[3]A number of these issues will be treated in the unpublished portion of this opinion.

We affirm the convictions of Robert Ager and Jean Jonas on count 4, exhibiting false accounts. We reverse and remand for yet a third trial as to all three Defendants on counts 1, 2 and 3 (conspiracy and embezzlement).[4] Our reversal is based on the following errors at the second trial: (1) the trial court erred by refusing to allow the Defendants to present evidence and to have a jury instruction as to the statutory defense of good faith claim of title; (2) the trial court erred by refusing to instruct the jury, at Robert Ager's request, that evidence that Guy Jonas (and Jean as his accomplice) unlawfully appropriated fraudulently generated production bonuses could not be considered as evidence of embezzlement by Robert Ager, who was not charged with embezzling the production bonuses he received, and by allowing the prosecutor to argue, over Ager's objection, that his receipt of the production bonuses could be considered as a criminal act by Ager which occurred within 3 years of the charging date;[5] (3) the trial court erred by instructing the jury that the Defendants could be convicted of embezzlement for failing to pay the interest due on loans from the insurance company to Ager and to Guy Jonas;[6] and (4) the trial court erred by instructing the jury as to various provisions contained in the Insurance Code, an error we deem harmless with respect to count 4 (which was the only violation of

---

[4]This ruling automatically vacates the Defendants' exceptional sentences and the restitution order. Accordingly, we need not address those issues in the disposition of this appeal. We do note from the record that each Defendant had already served his and her respective prison sentence by the time of oral argument for this appeal.

[5]Moreover, the prosecutor abandoned this theory of embezzlement, even as to Guy and Jean Jonas, by not including this act of alleged theft in their "to convict" instructions for count 3. Yet, the prosecutor was allowed, over a defense objection, to argue to the jury that the appropriation of the production bonuses could be treated by the jury as proof that a criminal act of embezzlement was committed by all three Defendants during the 3-year statute of limitations period preceding the filing of charges. This error must not be allowed to reoccur at the third trial as to any of the Defendants.

[6]The information fails to charge that the loans were embezzlements. See discussion, infra.

the Insurance Code with which these Defendants were charged) but not harmless with respect to the other counts.

## FACTS

### State's Theory of the Case

In 1980 Robert Ager and Guy Jonas purchased a controlling interest in the stock of General Security Life Insurance Company from PACO Partners. In 1982 General Security's name was changed to Life Insurance Company of America (LICA).[7] By the terms of the purchase and sale agreement, Ager and Jonas were required to pay PACO Partners $182,826 in two installments. Although these sums were not timely paid, they were eventually paid with funds embezzled from LICA.

In December 1980 Ager and Guy Jonas were elected to the board of directors of LICA. Thereafter, Ager became the chairman of the board, the president of the company and its chief executive officer.[8] Guy Jonas became the vice president of the company and the chief operating officer. Ager and Jonas and a third director were appointed to serve as the executive committee in charge of the daily operations of the company.[9]

Jean Jonas came to work as LICA's bookkeeper in September 1981.[10]

---

[7]Therefore, we will hereinafter refer to the company as LICA even though its official name was General Security Life Insurance Company until 1982.

[8]Ager also served as LICA's general counsel. Both he and Guy Jonas were attorneys.

[9]Guy Jonas had prior experience in the insurance industry. He had been president of Pacific States Life Insurance Company from 1967 through 1978 and had served as an examiner for the Oregon Insurance Commissioner's office. Ager and Guy Jonas had various business dealings and joint commercial enterprises with each other during Guy's tenure at Pacific States Life Insurance Company and after they purchased LICA.

[10]Jean Jonas had been the comptroller at Pacific States Life Insurance Company during Guy Jonas' tenure there. Guy and Jean were married while both were employed by that company. Several months before Jean went to work at LICA, she was introduced to the board as an expert in the intricacies of life insurance accounting and led and hour and a half discussion at a board meeting on the subject.

Insurance is a highly regulated industry. Officers and directors may borrow money from their companies, but only with the approval of two-thirds of the board of directors, and all such loans must be fully documented and reported (annually) to the Insurance Commissioner. The insurer's records must contain the name of any officer or director who has any interest whatsoever in the securities or other investments of the company. Officers in charge of the investments of an insurance company cannot have a financial interest in such investments (except for authorized loans).

For any disbursement of $25 or more by an insurance company there must be a voucher correctly describing the consideration for the payment and a canceled check endorsed by the person receiving the money.

Insurance companies cannot lawfully loan money without interest. If they acquire any mortgage or other security as an investment, they must be in first lien position. In order to claim the interest due on such an investment as an admissible asset, the interest payments cannot be more than 18 months in arrears. The Insurance Commissioner takes a keen interest in the company's ratio of admissible assets to the obligations owed to insureds. Assets which do not meet with the approval of the Insurance Commissioner cannot be considered when examiners determine a company's solvency.

Premium dollars and the investments purchased therewith are considered to be held in trust. Officers and directors have a fiduciary obligation to act in good faith, to abstain from deception and to preserve inviolate the integrity of insurance. It is unlawful for officers, directors and employees of an insurer to knowingly receive its property (except in payment for a just demand), to fail to keep full and true records, to make or concur in making any false entry in the insurer's books and accounts and to knowingly make any false reports of the financial condition of the company.[11]

---

[11]All of these regulations are contained in the Insurance Code. Violation of any of these provisions is a crime. *See generally* Title 48, Revised Code of Washington. As will be seen, these regulations became embodied in one form or another in the trial court's instruction to the jury at the second trial. There was also testimony at

Shortly after Jean Jonas became employed as the bookkeeper at LICA, the Defendants commenced not only to violate all of the above-referenced regulations[12] but also to systematically embezzle large sums of LICA's moneys.

In 1981 Ager and Jonas were authorized to receive salaries of $40,000 each. Instead, Ager received $114,537 in direct cash payments and Jonas received $43,322 in direct cash payments.[13] In addition, they spent thousands of dollars in undocumented "business expenses". Direct payments and "expenses" on behalf of Ager and Jonas totaled $193,000 — 38 percent of the total premium income generated for the year. To conceal their financial manipulations, it became necessary for the Defendants to falsify their annual statement which is required to be filed with the Insurance Commissioner each year. Otherwise, it would have become apparent to the board, the stockholders and the Insurance Commissioner that the company was being mismanaged.

Some of the cash disbursements to the Defendants were treated as loans (the board of directors never approved any of the nine loans taken out by Ager and Jonas in the ensuing 4 years). Notes were signed. Deeds of trust were executed on properties owned by Jonas and/or Ager but, with one minor exception, no payments of principal or interest were ever made. The values of the pledged properties were overstated. LICA was not in first position on most of the liens.

The statutorily required annual statement specifically asks whether there are any loans to officers or directors. In 1981 and in all of the ensuing years the answer to this question was "no" when it should have been "yes". Jean

the trial from various officials of the Insurance Commissioner's office as to these statutory requirements.

[12]The Defendants were charged, however, with only one violation of the Insurance Code, exhibiting false accounts in violation of RCW 48.06.190.

[13]For convenience, these and the other dollar values contained in this statement of facts have been taken from the affidavit of probable cause. To the extent that the testimony at trial may have been different, we deem that unimportant to the issues on appeal. Our purpose here is to illustrate the kind of evidence presented by the State and the complexity and magnitude of the alleged embezzlement scheme.

Jonas prepared all of these annual statements after consultation with Ager and Jonas.

In 1982 the board authorized salaries of $50,000 each to Jonas and Ager. In addition, they were granted incentive compensation of 1 percent of all premiums in excess of $1 million, from which each was authorized to receive $5,148 in 1982. Instead, Ager received $251,546 in direct cash payments and Jonas received $160,733. The pattern of personal expenses and undocumented "business expenses" being charged to company accounts continued unabated, and in fact substantially increased.

When an insurer sells more policies it must acquire more assets in order to meet reserves. To cover the fact that LICA's cash was being siphoned off instead of invested, it was necessary to manufacture new assets. In one ledger transaction $348,750 worth of mortgages suddenly appeared on the books. In another a $500,000 "home office building" appeared — although LICA was in leased space.

It was also necessary to falsify the 1982 annual statement and this was done.

In 1983 Ager and Jonas reported to the board, the stockholders and the Insurance Commissioner that out of concern for the financial problems of the company they would accept no salaries for the year. They also claimed to have obtained $600,000 in order to bolster the assets of the company. It was later determined that this contribution consisted of three wholly fictitious notes and mortgages for $200,000 each.[14] Moreover, at the end of the year $900,000 in additional mortgages were simply invented to make the books balance, *i.e.*, to cover the fact that LICA funds were not being invested but instead were being embezzled. Ager took $252,732 in direct cash payments that year. Jonas took $158,573. An additional $252,620 was taken out but there was insufficient detail in the records to show whether Jonas or Ager or one of their joint business enterprises received it.

---

[14]A onetime potential investor named Horback signed the notes, which were marked "paid in full" before he even signed them. Horback testified at trial under a grant of immunity.

As had by now become routine, the 1983 annual statement was falsified to cover the real facts.

In 1984 Ager and Jonas resumed their salaries. The board authorized $60,000 each. Authorized premium bonuses were $7,814 each. Instead Ager got $102,492 in direct cash, Jonas got $81,783 and one or the other or both got an additional $294,237. Credit card charges were sky high. "Business expenses" were not documented. The method of covering up the diversion of funds remained the same (false annual statement).

In 1985 authorized salaries for Jonas and Ager were again $60,000 each. Authorized premium bonuses were $26,452 each — for a total compensation of $86,452 each. Instead Ager drew direct cash of $124,519 and, while Jonas drew only $62,664, between the two of them and/or their privately held business enterprises an additional $324,229 was also paid out in cash.

During 1985 LICA was undergoing an examination by the Insurance Commissioner. The examiner was critical of certain assets. At midyear, $6 million in new assets was shown on the quarterly statement as being newly contributed to the surplus of the company. By year end, newly contributed assets were shown to total nearly $8 million for the year. These assets included gold mines, geothermal development rights, a note receivable from a nursing home and stock in a Louisiana bank. All of these contributions were shown to have come from a shell company known as ISA (wholly owned by Jonas and Ager). The receiver who took over LICA on February 5, 1987, was never able to find some of these supposed assets and the remainder had virtually no value.

By year end 1985 the annual statement showed $13.3 million in invested assets but of this only some $3.1 million was performing. The remaining $10 million consisted of artificially inflated values of mortgages shown as assets, wholly fictitious assets that existed on paper only and loans to Ager and Jonas on which no payments were being made.

In 1986 the company was not generating enough investment earnings to meet policy obligations and to pay current operating expenses. At the same time, Ager's and Jonas' embezzlements increased to an average rate of more than $100,000 a month for the year ($1.1 million total for the year).[15] The company simply needed more income. Guy Jonas created a new product called a "CD annuity", although it was an annuity in name only. It was designed to compete with banks and thrifts for short-term deposits. LICA did not obtain the statutorily required approval of the Insurance Commissioner to market the product.

In order to effectively market the product, Jonas paid a higher than usual commission to LICA's agents and promised an excellent return to investors with no penalty for early withdrawal. The product sold like hotcakes, generating $3.3 million in new premiums. The problem was that $700,000 in new investment earnings was needed just to break even on the marketing expenses and interest falling due to the premium payers. Instead of investing the necessary sums, Ager and Jonas continued to milk the company dry, and took production bonuses on the CD annuity as well.

By court order, the Insurance Commissioner seized LICA on February 5, 1987, and the embezzlements eventually came to light during the ensuing liquidation process. The 1986 annual statement had not been filed by February 5, but quarterly statements containing the by-then routine pattern of falsification were filed in 1986.[16] The statements were falsified over the years not only to cover up the thefts but also to hold the Insurance Commissioner at bay, so as to keep the cash cow producing.

---

[15]The cover-up was becoming more complicated — so complicated that Guy Jonas made seven pages of notes containing an analysis of what was necessary and pointing out that $285,000 diverted to ISA in 1986 could not be balanced by a receivable from ISA for the year because that would increase the receivable to $1.2 million, which would be a "red flag".

[16]The Insurance Commissioner was insisting upon quarterly statements in 1986 because the State's examiners were not able to complete the 1985 audit due to lack of information about claimed assets. The examiner never got to the expense side of the 1985 audit, even after spending 6 months in the LICA office.

### Defense Theory of the Case

Jean Jonas testified at both trials.[17] Contrary to its rulings at the first trial, at the second trial the court granted the State's motion to preclude all evidence, instructions and argument on the statutory defense of good faith claim of title. Neither could Jean Jonas testify as to her discussions with and disclosures to Mr. McKenzie, an examiner for the Insurance Commissioner who spent 6 months auditing LICA during 1985, as to certain bookkeeping entries and their underlying transactions. Jean wanted to so testify in support of the good faith claim of title defense and to rebut the evidence of criminal intent, but this was not allowed.[18] Moreover, defense exhibits which summarized actual repayments of various advances, accounts receivable maintained for various other advances, and offsetting entries balancing advances against salary, production bonuses and interest for surplus contributions were disallowed by the court.

Even the State's witnesses agreed that Jean's accounts were like a "four-lane highway", so easy were they to read and follow. There was no attempt to hide any of the appropriations that are the subject of these criminal charges. All were fully disclosed on the company books.

Jean testified that, although she was not an expert in statutory insurance accounting methods and had never read the Insurance Code, she had taken some specialized courses in insurance office management and had learned her accounting job over a period of some 15 years in the industry, from following the methods of experts and from following the advice of state examiners obtained during periodic audits.

She testified that when she answered "no" to the question on the annual statements regarding officer loans, she did so because she thought the question referred only to unsecured

---

[17]Guy Jonas testified at the first trial but not the second. Robert Ager testified at neither trial.

[18]The court also ruled that no evidence could be submitted in support of a claim of promissory estoppel based on McKenzie's conduct, which is a separate issue from good faith claim of title.

loans; all of the Ager and Jonas loans were secured loans. She also testified that she did not know the code required a two-thirds favorable vote by the board for officer loans. She had never attended a board meeting after the first one when she was introduced to the board. She had never read any of the board minutes until after the charges were filed. Although she was unable to point to any authorization for the officer loans contained in the minutes, and although she had heard the testimony of various board members who denied they ever authorized the loans, she frankly doubted their testimony.

Jean testified that she and her husband and Mr. and Mrs. Ager had become personally obligated on three-quarters of a million dollars worth of loans taken out from banks and other third party lenders to pay LICA obligations which LICA was unable to pay. In exchange for these contributions, LICA issued surplus contribution certificates. The Insurance Commissioner approved these transactions. The board authorized the certificates and set the amount of interest to be paid to Jonas and Ager. The certificates could not be redeemed until LICA acquired sufficient surplus, but interest could be paid and was either paid or offset by various advances given to Jonas and Ager.

When Jonas' and Ager's personal lines of credit became exhausted they borrowed money or took advances from LICA in order to service the personal debts they had incurred for the benefit of LICA. All of the loans from LICA were secured by notes and deeds of trust. Jean had no knowledge of any fictitious properties[19] or inflated-value properties. She knew that LICA was not in first position on some of the liens (it was on others).

The $500,000 "home office building" existed and was located at Fourth and Cedar in downtown Seattle (LICA's offices were in Bellevue).

---

[19]Jean testified that she believed Mr. Horback to have been a legitimate investor and that she never saw the paperwork for this transaction as Horback's attorney did that work. She only did the accounting in accord with what she had been told, which was that Horback had contributed $600,000 in secured notes to LICA.

In 1986 one of LICA's main checking accounts was "frozen" by a disgruntled creditor and LICA was unable to use that account to pay its claims and operating expenses. After consulting with the bank, it was arranged that LICA would continue to issue checks on the frozen account, but when the checks were presented for payment the bank would call Jean. She would then transfer other LICA-owned moneys to ISA and that same money would be used to buy back the LICA checks being held by the bank, with the disgruntled creditor being none the wiser.

Jean admitted this procedure was somewhat unusual, but it served the purpose of paying LICA debts with LICA money until the main checking account could be unfrozen, and the LICA money which went to ISA was an in-and-out transaction designed to pay LICA debts and not an act of theft.[20]

Jean testified that none of the advances paid to Ager and Jonas were thefts, rather, they were advances against moneys owed to Ager and Jonas for salary (also called management fees — the two terms were synonymous), production bonuses, interest due on the surplus contribution certificates and legitimate business expenses. Moreover, interest due from Ager and Jonas on their loans owed to LICA was also paid, at least once every 18 months (Jean testified she was aware of that requirement) by means of off-setting book entries, meticulously reducing the amount of moneys LICA owed to Ager and Jonas by the amount of the accrued interest.[21]

Jean also testified that the State's exhibits summarizing the charged transactions were misleading in that they summarized cash out but failed to account for the other side of the ledger, cash and other assets back in, including accounts

---

[20]Jean also testified that in 1985, $201,100 was transferred from LICA to ISA to pay LICA-owed claims. ISA was buying the California company which had issued the policies, but LICA was paying the claims as it would be acquiring the California company's assets once the purchase was completed by ISA. Thus, Jean testified, this transfer of cash was not a theft of LICA funds.

[21]During rebuttal testimony, LICA's receiver, Mr. Sterne, testified that Jean's testimony about the way she kept the books on all of these transactions was accurate.

received and receivable, as is required by the double entry, accrual system of accounting which she utilized.[22]

## DISCUSSION

### Good Faith Claim of Title

■■ A trial court's evidentiary rulings are reviewed for abuse of discretion. *State v. Ortiz*, 119 Wn.2d 294, 308, 831 P.2d 1060 (1992). Discretion is abused if it is based on untenable grounds. *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971). A decision based on a misapplication of law rests on untenable grounds. *In re Marriage of Bralley*, 70 Wn. App. 646, 651, 855 P.2d 1174 (1993).

Theft is defined in part as "[t]o wrongfully . . . exert unauthorized control over the property . . . of another . . . with intent to deprive [the owner] of such property[.]" RCW 9A.56.020(1)(a). To "exert unauthorized control" means:

> Having any property . . . in one's possession, custody or control as . . . employee . . . or officer of any . . . corporation . . . to secrete, withhold, or appropriate the same to his or her own use or to the use of any person other than the true owner[.]

RCW 9A.56.010(7)(b).

■ This is the embezzlement portion of the theft statute. "Embezzlement occurs where property that comes lawfully into the taker's possession is fraudulently or unlawfully appropriated by him." *State v. Gillespie*, 41 Wn. App. 640, 643, 705 P.2d 808 (1985) (citing *State v. Vargas*, 37 Wn. App. 780, 785, 683 P.2d 234 (1984)), *review denied*, 106 Wn.2d 1006 (1986). Thus, embezzlement involves the violation of a trust. *Gillespie*, 41 Wn. App. at 643 (citing State v. Moreau, 35 Wn. App. 688, 693, 669 P.2d 483 (1983), *review denied*, 102 Wn.2d 1019 (1984)). Embezzlement *does not* require an intent to permanently deprive. *Gillespie*, 41 Wn. App. at 643 n.3 (citing

---

[22]The trial court rejected the defense exhibits which summarized this other side of the ledger on grounds that the intent to repay embezzled funds was not relevant and therefore not admissible at the second trial. We agree with that premise. We point out, however, that it is the State's burden to prove embezzlement and that Jean's bookkeeping entries were relevant to the defense of open and avowed appropriation under good faith claim of title. See discussion, *infra*.

*State v. Markham*, 40 Wn. App. 75, 86, 697 P.2d 263, *review denied*, 104 Wn.2d 1003 (1985)).

The theft statute incorporates the defense of good faith claim of title:

> In any prosecution for theft, it shall be a sufficient defense that the property . . . was appropriated openly and avowedly under a claim of title made in good faith, *even though the claim be untenable.*

(Italics ours.) RCW 9A.56.020(2).

█ If there is evidence supporting the defense of good faith claim of title, it is reversible error not to give the instruction. *See State v. Hicks*, 102 Wn.2d 182, 186, 683 P.2d 186 (1984). It follows that it is also reversible error to disallow the evidence if it meets the statutory requirements for the defense.

█ The instruction should not be given in cases of theft involving patent deception, however, because patent deception is inconsistent with an open and avowed appropriation. *See State v. Emerson*, 43 Wn.2d 5, 12, 259 P.2d 406 (1953); *State v. Pestrin*, 43 Wn. App. 705, 710, 719 P.2d 137 (1986) (citing *State v. Wellington*, 34 Wn. App. 607, 612, 663 P.2d 496, *review denied*, 100 Wn.2d 1006 (1983)). *See also State v. Ellard,* 46 Wn. App. 242, 245, 730 P.2d 109 (1986), *review denied*, 108 Wn.2d 1011 (1987).

The State argues that this case involves a patent deception: just as the Defendants did not get board approval of their loans,[23] they did not get board approval for the advances and they covered up the fact that the huge sums of money they were taking out of the company were not being properly invested by soliciting the contribution of fictitious assets and by contributing assets of their own at grossly inflated values. The State also points to the falsified annual and quarterly statements which were filed with the Insurance Commissioner, characterizing them as patent deception to cover up the thefts.

---

[23]The Defendants were not charged with embezzling the loans, but only the interest thereon, about which see discussion, *infra*.

The Defendants respond that Jean kept meticulous books, upon the pages of which were kept a precise accounting of every loan and every advance. So clear were these records that they constituted a veritable "four-lane highway" of open, avowed and easily followed transactions. Although the Insurance Code prohibits loans to officers without the approval of two-thirds of the board members, there is no such requirement with respect to advances.[24] The books of the company were available for inspection at any time by all of the directors. The books were audited not only by the State but also by a private, independent accounting firm hired by LICA. Jean was never criticized for her method of recording the advances. No state examiner ever questioned the advances or Jean's open and avowed accounting of the advances.[25]

The State relies primarily upon *Moreau*, the only Washington case to have examined the good faith claim of title defense in the context of an embezzlement.

In *Moreau* a company bookkeeper who had authority to write checks but no authority to borrow money from the company wrote herself $500 worth of checks which she later claimed were loans. When being tried for embezzlement she

---

[24]This is correct. As was admitted by the State's insurance experts at trial, the Insurance Code mentions advances only once. *See* RCW 48.12.020(3), which provides that advances to officers (other than policy loans or board-approved loans) are not admissible assets, whether secured or not. "Advances" are not defined in the code.

The National Association of Insurance Commissioners (NAIC) puts out a manual which is mentioned in the code and which contains instructions as to how advances are to be reported in the annual statements. The jury heard a State's witness read this section of the manual, which provides that amounts the company has placed at the disposal of company officers to carry out their required activities shall be reported on a specific line of the annual report.

In the annual statements filed by LICA the line for advances was left blank or filled in by the statement "none".

[25]A state examiner testified at trial that he had never seen such large sums posted as advances as in this case, but agreed that statutory accounting requirements do not set any deadlines for repayment of advances. The code does seem to contemplate that officer advances will occur and may even be secured, implying that they may be outstanding for a considerable period of time and that they are not necessarily restricted to use for company purposes. *See* RCW 48.12.020(3).

asked for a jury instruction on good faith claim of title, which the trial court refused to give. Division Three of this court affirmed, pointing out that the bookkeeper had no authority to make herself loans from the company account, but also stating: "Even assuming that she had the right to make these loans to herself from company funds, that would give her no good faith claim of title." *Moreau*, 35 Wn. App. at 695.

This statement is, of course, dicta. It is dicta with which we disagree. If the employer had given the bookkeeper authority to make herself these loans, that *would* give her a good faith claim of title.[26]

The State also analogizes good faith claim of title to self-defense. In *State v. McCullum*, 98 Wn.2d 484, 488, 656 P.2d 1064 (1983), the Supreme Court noted that to justify a jury instruction "there need only be *some* evidence admitted in the case from whatever source which tends to prove a killing was done in self-defense." (Citations omitted. Italics ours.) The court noted further that a defendant need not be in actual danger, but need only believe in good faith and on reasonable grounds that he is in actual danger of great bodily harm. Even if the defendant is mistaken, the defense is still available if the defendant acted as reasonably and ordinarily cautious persons would have done under the circumstances as they appeared to them. *McCullum*, 98 Wn.2d at 489.

Applying this reasoning to the good faith claim of title defense to a theft charge, the State argues that the trial court must determine as a matter of law whether there is

---

[26] *Cf. State v. Hamilton*, 58 Wn. App. 229, 792 P.2d 176 (1990), wherein an attorney was charged with 12 counts of theft from the estate of a deceased client. The attorney wished to testify that before his death the client stated that he did not want his children to get his money and gave the attorney permission to use the money to strengthen his law practice and to repay it as he saw fit. The attorney claimed he executed promissory notes each time he withdrew any money. This testimony was rejected by the trial court, in limine, on the basis of the deadman's statute and as hearsay. Division Three of this court held that the deadman's statute did not apply in criminal proceedings and that the statements were not hearsay as they were not offered for the truth of the statement but as evidence of the attorney's state of mind. The evidentiary ruling was reversed and the case was remanded for trial.

Although the appeal was not directly concerned with the good faith claim of title defense, that is the obvious basis for the testimony the attorney wished to give.

"credible" evidence that the defendants (1) made an open and avowed appropriation (2) under a claim of title (3) made in good faith. Br. of Resp't, at 22-23.

There are two major problems with this argument. First, unlike self-defense where the good faith belief that one is in danger must be reasonable, the good faith claim of title statute provides that even though the claim may be "untenable", RCW 9A.56.020(2), it is nevertheless a complete defense so long as the claim was open and avowedly made and so long as it was made in good faith. Second, whether the claim was "credible", *i.e.*, whether it was made in good faith (no matter how untenable) presents a jury question. The single exception in Washington law is if the property was obtained by patent deception, for that is entirely inconsistent with an open and avowed appropriation. *See, e.g., State v. Emerson*, 43 Wn.2d 5, 259 P.2d 406 (1953) (theft by deception — defendant made false representations of material fact to induce the victims to part with their money); *State v. Pestrin*, 43 Wn. App. 705, 719 P.2d 137 (1986) (theft by deception — defendant rolled back odometers on used cars which he later sold without revealing the deception). An open and avowed appropriation of property made under an untenable but nevertheless good faith claim of title negates the criminal intent which is inherent in a theft, that is, the intent to unlawfully deprive another of his property. *See State v. Hicks*, 102 Wn.2d 182, 184, 683 P.2d 186 (1984).

Here, Ager and Jonas, through Jean's testimony, took the position that they were merely taking advances against their salaries, production bonuses, reimbursements for legitimate business expenses,[27] and interest on their surplus contribution certificates.

These appropriations were arguably open and avowed, in that Jean kept meticulous records which were subject to board inspection at any time, and which the State's witnesses compared to a "four-lane highway" of clarity. Arguably they were not open and avowed, since they were never authorized by or disclosed to the board of directors. Whether

---

[27]Ager and Jonas traveled extensively for LICA as well as for ISA, which they contended was a legitimate holding company for LICA.

these appropriations were open and avowed and taken in good faith presents a jury question.[28]

Conflicting evidence suggests that the appropriations were covered up by deceptive means, in spite of Jean's meticulous records. The quarterly and annual statements specifically denied any advances as defined in the NAIC manual — but these advances do not fit that description. The fictitious assets, particularly the Horback notes marked paid in full before they were signed, present damning evidence, especially as against Guy Jonas, who arranged those transactions, but that evidence is most damning as to count 4, exhibiting false accounts. Guy's intent, and that of the other Defendants, to cover up theft presents a jury question.

LICA was a very sick company from the start. There is unrefuted evidence that it was not what it was represented to be at the time of purchase. The Defendants hoped to build a veritable empire, with ISA as the parent holding company and with LICA as the first among many "sibling" companies. To keep LICA afloat, it is undisputed that the Defendants incurred three-quarters of a million dollars in personal debt. LICA could not be kept afloat if it were seized by the Insurance Commissioner by reason that it was insolvent.

By the State's theory, keeping LICA afloat was simply for the purpose of keeping the cash cow alive for the purpose of embezzlement. By the defense theory, keeping LICA afloat was the first step toward their goal of realizing their ultimate dream, and there never were any embezzlements.

A rational jury which heard *all* of the evidence, as this jury did not, could rationally decide that the false annual statements were to hold the Insurance Commissioner at bay, but that what the State characterized as embezzlements were, instead, just what the Defendants said they were and just what Jean's records proclaimed them to be. That we may find the explanation untenable does not alter our conclusion. Indeed, that same jury could just as rationally

---

[28]The trial court reasoned that the Defendants were required to present some factual basis for their alleged good faith belief that they were authorized to take the advances. See Clerk's Papers, at 242-43. If this is so, it is clear from the statute that the factual basis need not be tenable but merely held in good faith. Good faith is a jury question.

decide that the State's theory of the case was proved beyond a reasonable doubt.

On this record, we cannot find as a matter of law that the patent deceptions contained in the false annual statements were for the purpose of covering up theft. Whether that is so presents a jury question, as does the issue of whether there were any thefts at all.

In sum, the Defendants were entitled to present their evidence of good faith claim of title and to the jury instruction which was given at the first trial.[29]

## Production Bonuses

■ As earlier mentioned (footnote 4), not only was Robert Ager not charged with embezzlement of the production bonuses but also that theory of theft was abandoned altogether when the State submitted its "to convict" instructions for count 3 (embezzlements by Guy and Jean Jonas). See Clerk's Papers, at 257-64, inclusive. Ager is correct in his challenge to the trial court's rejection of his request for a limiting instruction. *See* ER 105. *See also State v. Aaron*, 57 Wn. App. 277, 281, 787 P.2d 949 (1990) (limiting instruction is mandatory, if requested).[30]

Contrary to the State's assertions in its Brief, it did argue to the jury, over a defense objection which was overruled by the trial court, that the jury could treat the receipt of these production bonuses as evidence of a theft occurring within the statute of limitations. See Report of Proceedings (closing arguments) (Nov. 1, 1990), at 52-53.

■ We do not believe the "to convict" instructions omitting the production bonuses as an act of theft cured the error.

---

[29]This is not to say that the Defendants were entitled to the defense of promissory estoppel. We summarily affirm the trial court's ruling in that regard, without further discussion. *Cf. Kueckelhan v. Federal Old Line Ins. Co.*, 69 Wn.2d 392, 418 P.2d 443 (1966). Jean's disclosures to the state examiners, whatever they may have been, only have relevance to the open and avowed prong of the good faith claim of title defense and to the weight to be given Jean's testimony that there was no criminal intent. A full and open disclosure on the books and to the examiner would tend to negate criminal intent.

[30]Had the State not abandoned this theory as to Guy and Jean, this evidence may have been relevant as to Ager for purposes of the conspiracy charge. That would not have vitiated the need for a limiting instruction so stating, however.

This was a monthlong trial filled with complex testimony and massive documentary evidence of an extremely technical nature. Although this jury was instructed that the attorneys' arguments were not evidence, among the most understandable concepts before the jury was that the CD annuities were not approved by the Insurance Commissioner. It was also very clear that the jury had to unanimously agree that at least one act of theft was committed by each Defendant after February 16, 1986. The prosecutor pointed to three such acts during closing argument. One was the transfer of LICA funds to ISA in 1986 (Jean justified that during her testimony; a rational juror may have believed her explanation). Another was the production bonuses from the CD annuity, for which Ager was not charged and that theory was abandoned as to Guy and Jean as well. Thus, that argument was improper. The third was the undocumented business expenses, which may be evidence of theft but is hardly proof positive. The trial court's erroneous rulings on this issue both at trial and during argument leave us unable to determine that this jury did not convict on the basis of these production bonuses, in spite of the "to convict" instructions. We also reverse and remand the conspiracy and embezzlement convictions on this basis.

### Interest Due on Loans

■ The Defendants were not charged with theft of loan principal, but only of the interest due thereon, even though the loans were not authorized, and even though the security provided for the officer loans was inadequate. In *State v. Gillespie*, 41 Wn. App. 640, 645, 705 P.2d 808 (1985), *review denied*, 106 Wn.2d 1006 (1986) it was held that where a loan is made on a promissory note, title to the loan proceeds passes when the borrower signs the note. *See also State v. Berman*, 50 Wn. App. 125, 130-31, 747 P.2d 492 (1987) (not embezzlement to default on a loan), *review denied*, 110 Wn.2d 1019 (1988). Compare *State v. Moreau*, 35 Wn. App. 688, 695, 669 P.2d 483 (1983) (unauthorized loan charged as embezzlement), *review denied*, 102 Wn.2d 1019 (1984).

The State has not responded to the Defendants' argument that to default on a loan, be it a default as to principal or a

default as to interest, is not embezzlement. Having elected in the charging document to treat the principal of these unauthorized loans as loans and not thefts, we do not believe the State can treat the interest due on these same loans as stolen money. On remand, this theory of theft must be stricken from the "to convict" instructions.

## Instructions

The last issue which we will discuss in the published portion of this opinion is the trial court's instructions taken from the Insurance Code.

Ager and Jean Jonas assign error to instructions 35-42A.[31] It will be recalled that the Defendants were charged with only one violation of the Insurance Code, see count 4, exhibiting false accounts.

The State argues that these instructions correctly state the law (they do, insofar as they set forth provisions found in the Insurance Code) and that they are supported by the evidence at trial. The State's expert witnesses referred often to the code, including most if not all of the sections contained in the disputed instructions. In addition, several sections of the code as contained in the instructions were read to Jean Jonas during her cross examination by the prosecutor. Thus, there was evidence at the trial as to the content of these code provisions.

However, in this particular trial, the code provisions contained in the disputed instructions (except for the provisions relating to exhibiting false accounts) constituted *facts* and not the law of the case with respect to conspiracy and theft.

The Washington Constitution, article 4, section 16 provides that "Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law."

---

[31]The instructions are too lengthy to be included in this opinion. The interested reader can ascertain the nature of these instructions by reviewing the following sections of the Insurance Code: RCW 48.13.350; RCW 48.07.100; RCW 48.12.010(2)(c); RCW 48.13.020; RCW 48.07.130(1); RCW 48.30.120; RCW 48.01.030; and RCW 48.13.340. *See also* RCW 9A.04.110(16) (corresponds with instruction 40) defining pecuniary benefit.

A court cannot instruct the jury that matters of fact have been established as a matter of law. *See State v. Barringer*, 32 Wn. App. 882, 887-88, 650 P.2d 1129 (1982); *State v. Primrose*, 32 Wn. App. 1, 3, 645 P.2d 714 (1982). In effect, that is what happened here. *Cf. Hizey v. Carpenter*, 119 Wn.2d 251, 830 P.2d 646 (1992) (in action for legal malpractice, plaintiffs attempted to apprise jury of Code of Professional Conduct through expert testimony and jury instructions; trial court's exclusion upheld).

This error should not be repeated at the new trial.[32]

For the reasons above stated, we reverse and remand for a new trial on the conspiracy and theft charges.

A majority of this panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

GROSSE and BECKER, JJ., concur.

Reconsideration denied October 27, 1994.

Review granted at 126 Wn. 2d 1008 (1995).

---

[32]We deem the error harmless as to count 4, in that the insurance law contained in most of the challenged instructions bears some peripheral relationship to the charge of exhibiting false accounts. Ager and Jean Jonas raise no issues in this trial that persuade us they did not get a fair trial as to count 4. Accordingly, we affirm as to count 4.